# COURT OF APPEALS OF TEXAS.

## TYLER TERM, 1886.

[No. 2297.]

### W. A. M. GOLDEN v. THE STATE.

1. PRACTICE—CASES OVERRULED.—BILLS OF EXCEPTION, both in criminal and civil cases, are required by statute to be presented to the judge for his allowance and signature during the term, and "within ten days after the trial," and, when signed by the judge, to be "filed with the clerk during the term." *Held*, that the limitation of "ten days after the trial" applies only to the presentation of the bill to the judge, and does not apply to the filing of the bill with the clerk. In so far as it is otherwise held in Keeton's case, 10 Texas Court of Appeals, 686; Cummins's case, 12 Texas Court of Appeals, 121, and Morris's case, 17 Texas Court of Appeals, 660, those cases are overruled.

2. PRACTICE—EVIDENCE.—In a trial for felony the State offered as evidence the testimony of certain witnesses, which was taken and reduced to writing at the examining trial of the accused, who was then confronted with and cross examined them. The predicate laid was the absence and residence of the witness in another State. The defense objected on the ground that the witnesses were absent from the State by the aid and procurement of the attorney for the State. The county attorney made oath that he did aid the witnesses to return to their home in a distant State, because they were helpless and destitute women who, after coming to Texas at the inducement of the accused, were swindled by him out of all their means of support, and they were aided to return to their home by the deponent to enable them to obtain subsistence, and not for the purpose of depriving either the accused or the State of their testimony in person. The trial court overruled the objection, and the ruling is held correct.

3. SAME.—The defense also objected on the allegation that the magistrate who held the examining court had failed to write his name across the seal of the envelope containing the written testimony, as required by law. But there being nothing in the bill of exceptions or the record to verify the allegation, the presumption is against its truth, and the objection is futile.

4. SAME.—A third objection was that the magistrate's certificate to the written testimony failed to show that it had been read to or signed by the witnesses, as required by law. *Held*, that the testimony is shown by the record to have been duly signed by the witnesses, and it is not necessary that the magistrate's certificate should affirmatively state that the testimony was read to or by them. No particular form for the certificate is prescribed by law, and the presumption obtains that the magistrate complied with the directions of the law in such matters.

5. INDICTMENT FOR EMBEZZLEMENT is sufficient if it substantially conforms to No. 509 of Willson's Criminal Forms.

6. EMBEZZLEMENT BY HUSBAND OF WIFE'S MONEY.—See the opinion of the court for the instructions given to the jury on the appropriation by a husband of his wife's money; which instructions are held correct in view of their relevancy to the facts in proof.

7. THEFT—EMBEZZLEMENT.—The first count of the indictment charged the appellant with the theft of certain money, and the second count charged him with the embezzlement of the same money. He was convicted under the second count, and objects because the evidence sufficed to prove him guilty of theft as charged in the first count. *Held*, that the objection is not maintainable, and the conviction is sustained.

8. SAME—FACT CASE.—See the statement of the case for evidence which amply sustains a conviction for embezzlement, and which would have warranted a conviction for theft.

APPEAL from the District Court of Lamar. Tried below before the Hon. D. H. Scott.

The first count of the indictment charged the appellant with the theft of one hundred and seventy-five dollars United States paper currency, belonging to E. J. Weedon, on November 23, 1885. The second count charged him with embezzlement of the same money. He was convicted under the second count, and his punishment was assessed at nine years in the penitentiary,— well merited in view of the detestable depravity disclosed by the evidence of the nefarious means by which the appellant, who claimed to be a minister of the Gospel, defrauded helpless and friendless women out of all their hard earned money.

In December, 1885, an investigation of this case was had before a justice of the peace sitting as an examining court, and the principal witnesses were examined and their testimony reduced to writing. On the trial in the district court this written testimony was the first evidence offered by the State. The predicate laid was the absence and residence of the witnesses in the State of North Carolina. One objection interposed by the defense was that the witnesses were absent by the aid and procurement of the attorney for the State.

In support of the predicate and reply to the objection, J. W. Ownby, Esq., stated under oath that he was county attorney of Lamar county in December, 1885, when the examining trial of the appellant was held, and he had ever since been, and still was, the county attorney. It was true that he assisted the witnesses (E. J., Nancy and Harriet Weedon) to leave this State. He made up money to pay their way back to North Carolina. He wrote and had published an article calling on the citizens to assist the said witnesses in getting money to pay their fare back to North Carolina. He did not try to get them to remain and testify in this case, nor had he tried to get them to return and attend the trial of this case. He could not get them back by any process of law, and he knew it was useless to ask them to come back. They were gray headed, unmarried women, who had been defrauded by the appellant out of everything they had. They were in destitute circumstances, left in mid winter with nothing to eat, nothing to do, and no place to sleep. The neighbors carried them food. They were gray headed women, one of whom was a cripple and unable to get out of her seat. They wanted to go back to their home in North Carolina, where they could get work. For the reasons above set out, and as an act of simple humanity, and not for the purpose of sending the witnesses beyond the process or jurisdiction of the court, he, the county attorney, did assist them to go back to their home. In certifying the bill of exceptions, the trial judge states that the testimony offered was clearly identified, and was shown to have been taken in conformity with law, having been read over to and signed by the witnesses, and that the accused was present and cross examined them.

All objections being overruled, the first evidence offered by the State was the testimony given before the examining court by Mrs. E. J. Weedon, the person alleged as the owner of the money. It was as follows:

"I am acquainted with W. A. M. Golden. I first became acquainted with him at Carolina Mill, Alamance county, North Carolina. I have known him since October 1, 1885. I learned his name and formed his acquaintance at my house. He claimed to be a Methodist preacher, a music teacher and a school master, and came there to hold a protracted meeting. I have heard him preach. He became acquainted with all my family and visited at my house. He married my daughter the twenty-sixth of October, 1885. He left the same day, with my daughter, saying that he

was going to Florida, where he had an orange grove, and that he would send for the whole family. We next heard from him at Paris, Texas, the next Tuesday after he left on Monday. He at that time dispatched me to send him three hundred dollars at once. I did not send him the money. He subsequently wrote me several letters begging for money. He knew that we had money when he left. Myself and my sister and my afflicted sister gave my daughter three hundred dollars when they were married. We afterwards came to Texas, arriving on the twenty-second of October, 1885. Nancy Weedon and Harriet Weedon and Mollie Weedon and myself came. Mr. Golden and my daughter met us at the depot. He, Mr. Golden, carried us to a boarding house. At the gate of the boarding house he asked me for money to pay our fare, and also asked me if I brought money with me. I told him to wait. I gave him money to pay the fare. We stayed at the boarding house on Sunday night and went on Monday morning to a house I had rented. I saw Mr. Golden at the rented house on Monday morning, the twenty-third of October, 1885. I was in the dining room, fixing the table. Mr. Golden came in there and said, 'Now, I want all the money you have got.' I asked him what for. He said I was in danger every moment I kept it here. I asked him what he was going to do with it. He said he was going to put it in the bank for safe keeping for me. I told him 'well,' and he said, 'I am in a hurry;' and I turned off to a little entry that came from the cook room into the dining room, to get it out of my bosom, where I carried it to keep it safe, and he faced around to me and said, 'hurry—I am in a hurry—you are in danger every moment you keep it here.' I motioned him off and told him to go away if he had any manners; that I would give it to him as quick as I could. I then went into the cook room and left him, and he followed me in there and faced me, putting his hand to my bosom, and said 'hurry,' and I took the money out of my bosom and gave it to him, and he would not wait for me to get it out of the little pocket in which I had it, but took it and took it out himself. When he started out I said 'let me go with you to the bank.' He said no, there was no need of that. I said, 'suppose something were to happen to you, I would not know where to get the money.' He said he would have all that fixed. He did not tell me which bank, but said he would bring me back a receipt. I afterwards asked him if he put the money in the bank, and he said yes, it was there safe. The same evening he came

back late in the afternoon (not coming to dinner), and came back after supper, about nine o'clock, and stayed until nine the next morning. He left on Tuesday morning at nine o'clock, and came back about mid-day, and also came home to supper and went back to town, and did not come back until just before day. He went up town Wednesday morning and came home to dinner, and went to town after dinner and came back about dark, and stayed there all night, and left Thursday morning about nine o'clock; which was the last I saw of him until now.

"The money I gave him was United States of America paper currency money—current money of the United States of America. I let him have one hundred and seventy-five dollars on Monday, of the value of one hundred and seventy-five dollars. It was my money. It was tens, twenties and five dollar bills. He took and used the money without my consent; and if he afterwards used it, it was without my consent. This occurred in Lamar county, Texas. The money was in my possession when taken. This occurred on November 23, 1885. My husband has been dead about thirteen years. I have been working with my two daughters in a cotton mill, and we accumulated this money by our work during about nine years, at our home in North Carolina.

"I was afraid of Mr. Golden at the time I gave him the money. My fear arose from his appearance, his actions, etc. I was a stranger here and had no relatives or acquaintances, and had only been here one night. Mr. Golden has never returned my money or any part thereof."

On her cross examination, Mrs. Weedon testified as follows: "My husband's name was Simpson; my maiden name was Weedon. I was alarmed at Mr. Golden's manner when he approached me. I never demanded the money of him before he was arrested, and did not say anything about it except to my sisters. We were all living together in the same house in Paris, keeping house. Before Mr. Golden left he gave Ellen Golden, his sister, eighty dollars, and told her to give it to me, and sent a note in which he said, 'Ella, here is eighty dollars for you and your aunts and your mother to spend. Don't be uneasy about me; I am going away.' He next morning dispatched me from Bonham to send him fifty dollars of the money. The note is down home; I have not the dispatch.

"I had sworn out a complaint against Golden before I got the dispatch. * * * My sisters and daughter were present when

he got my money. Mr. Perry came in a short time after I gave Golden the money, and Golden and Perry went to Hancock's for a trunk. Perry traveled with us from Memphis to Paris, Texas; he was coming to Paris. When I let Mr. Golden have the money he made no threats and drew no weapons; his manner excited me. I was scared and troubled so that I did not know whether it was himself or some one else that he meant would get my money.

"I wrote Mr. Golden from North Carolina, in answer to his letter, that I would bring the money when I came, but did not say I would give it up. We had agreed to give him the money when he came in, if he would get us a home. He said, after we came here, that he had bargained for a piece of land with Mr. Latimer, in Paris. I did not turn over the money to buy anything, but for safe keeping. I have stated about all that I said to him when I gave him the money. I told him then to let me go to the bank with him, to see the parties, but he refused to let me go. He used no violence, force or threats, more than to put his hand on my bosom, when I turned him over the money. I turned the money over to him freely and voluntarily. I did not tell Mr. Perry anything about it when he came. I turned the money over to Mr. Golden, all of a tremble."

By a supplementary statement signed by Mrs. Weedon and certified by the examining magistrate, it appears that she further stated that after she and her sisters reached Paris, Texas, the defendant furnished them three bed steads, a stove and some cooking utensils, the value of which she did not know; and also a sack of flour, a ham of meat, and about a dollar's worth of sugar and coffee, ten dozen eggs, and a pound of butter. He rented the house for the family. Witness's lawful name was Simpson, as her husband was named William Simpson, but since his death the family had called her by her maiden name, Weedon. Her daughter, defendant's wife, was twenty years old in September, 1885, and was married under the name of Simpson. The supplies furnished by defendant were got by him before the witness turned over to him the hundred and seventy-five dollars. After he got the money he did not seem to want to talk to her, or have anything more to say or do with her, and acted as a stranger. When she found he had left, she told Mr. Perry her money was gone, and went to the office of J. W. Ownby, Esq., the county attorney, and made complaint against Golden. After he got her money she was uneasy about it on account of his

actions. She turned it over to him both because she was afraid of him and as her agent to put it in bank. She did not go or send to the bank to ascertain about her money, because she did not know where the bank was. He brought to her no receipt for it from any bank, as he had promised to do when he got it.

The next evidence put in by the State was the written testimony of Miss Nancy T. Weedon, a sister of Mrs. Weedon, taken at the examining trial of the appellant. It corroborated clearly the most material of the statements already detailed in the testimony of Mrs. Weedon, and divulged the further facts that by similar means and the same pretexts the appellant also obtained from this witness one hundred and sixty-nine dollars, and from her crippled sister one hundred and fifty.

By consent of the defense, the State introduced the written testimony of H. A. Bland, cashier of the Farmers' and Merchants' Bank of Paris, Texas, given at the examining trial of the appellant. The witness stated that on November 23, 1885, the appellant came into said bank and said he wanted to make a deposit, and witness received from him one hundred and thirty dollars in paper currency. He deposited it in the name of W. A. M. Golden. The next day he made another deposit of one hundred and twenty dollars, currency, in his own name of W. A. M. Golden. On the next succeeding day the bank paid his check for fifty dollars, and on the second day thereafter he checked out his balance of two hundred dollars. He had had no previous deposits with the bank.

W. T. Gunn, for the State, testified that he knew a man who gave his name as W. A. M. Golden. On a dispatch to the sheriff of Fannin county, the witness had said Golden arrested by said sheriff at Bonham, on November 28, 1885. The sheriff found one dollar and fifty cents in Golden's possession.

B. F. Perry, for the State, testified that he first met the three Misses Weedon at Memphis, on their way from North Carolina to Texas, about November 20, 1885. One of them was a cripple, and witness assisted them along until they arrived at Paris, Texas. The appellant met them at the depot. Witness boarded with them a little while after they began house keeping. The day the defendant left, three noted gamblers of the town came to the house, anxiously inquiring for him. They left word for him to come to the White Elephant saloon as soon as he showed up, and for him to come in the back way if he came in day time. Witness then told Mrs. Weedon and her sisters that their money

was gone,—which he had learned the defendant had got from them. Witness accompanied Mrs. Weedon to the court house, to swear out the complaint against defendant. A few days later the witness saw the defendant at his examining trial. Witness had never offered to take defendant's wife to a hotel and furnish her board, nor had he ever advised her to quit her husband.

W. J. Warren, for the State, disclaiming any purpose of criminating himself, testified that he saw defendant several weeks before he was arrested, and knew that he had some money, and that he was going to get some more, as he so told witness. Witness saw him a few days before his arrest, and he then had some money. The night before the defendant left home, witness saw him at the White Elephant saloon, and he then had money, and also some deposit checks on the Farmers' and Merchants' Bank. Defendant was betting at faro. Witness left about ten o'clock that night, and up to that hour the defendant had lost about one hundred and seventy-five dollars, and was betting his deposit checks, and still losing,—the game seemed to be going against him. He had been gambling for several days, and witness, who was interested in the gaming bank, took some of the defendant's checks as collateral. But, on witness's arrival at the said bank, the next morning, he learned that the Rev. Mr. Golden (the defendant) had anticipated him and drawn out of the bank all the money he had there. Witness did say, on the day Golden left, that he intended to catch him and get his (witness's) money, and he would have taken the money from Golden if he could have found him. Witness did not hire two horses to follow Golden, nor go out of Paris that day, though friends of the witness may have hired two horses that day on his credit, which was good at the livery stable. The State rested on the foregoing evidence.

Mrs. Lackey, a sister of the defendant, testified in his behalf, that he came by her house the morning he left Paris, and sent eighty dollars by her to the Weedon women, and told her to tell them where he had arranged to get milk, etc., and that he was going away for a few days. Two men came to her house hunting the defendant after he left, and one of them said his name was Shillings. They would not tell witness what they wanted with him, but their manner indicated their anxiety to find him.

Mrs. Ella Golden, defendant's wife, testified in his behalf, that the money turned over to her husband by her mother and aunts

was her, witness's, money, sent to her by her uncle who lived in Missouri, who sent it to her mother to educate her, the witness, though she never sent witness to school. Witness could neither read nor write. "They" (her mother and aunts), gave witness and her husband three hundred dollars of the money when she was married, and said they would bring the remainder when they came out to Texas. When they came to Paris they voluntarily turned all the money over to the defendant, and told him to take it and use it just as he wanted to.

On her cross examination, this witness stated that she remembered testifying in the examining court. "They" (evidently alluding to the Weedon ladies), told her what she had to say, and threatened to choke her if she did not. Her mother and aunt sat on either side of her, and would punch her and tell her what to say. They would not let her talk to defendant until after she had testified, nor let her see any one at home previous to the trial. She did, at the examining trial, testify that the defendant locked her up in a room at Memphis all day; but her mother told her she had to swear that. Witness did not, at the examining trial, state that the money belonged to her. Her uncle sent her that money at five or six different times. Some times he sent her one hundred dollars, and some times fifteen or twenty. She never saw her uncle. She did not remember testifying in the examining court that she did not know whether or not the money was turned over to the defendant voluntarily, nor that she testified that she did not know why it was turned over to him, but supposed it was to make a living with. She remembered that Mr. Perry and County Attorney Ownby came, the night before the examining trial, and asked her about the case, and that she told them that the defendant locked her up in the hotels at every place they stopped at on their way to Texas, and that she would be confined all day by herself; but "they" told her to tell that. She did not remember telling Perry and Ownby that her husband told her he was going to telegraph to her mother for three hundred dollars, and that if she did not send it he would write for them to come out to Paris, as that was the only way he could get their money, and that when they came he was going to get their money and then take witness and go west, leaving them. "I did (not?) tell them that." Before witness's mother and aunts came to Paris, the defendant showed her a picture of a lady and child, and said that was his other wife, and asked witness if she was mad about it, and said that he would give her

a good whipping if she told her mother and aunts what he was going to do. She did not remember telling Perry and Ownby that she was afraid of defendant because he had treated her so badly, and that she believed she could (not?) testify if he was where he could look or speak to her. She was not under any kind of duress when she testified at the examining court, but believed she did ask Mr. Ownby to protect her.

In rebuttal, the State again introduced B. F. Perry, who testified that he was acquainted with the defendant's wife, and was present when Ownby had a conversation with her the night before the examining trial. This witness circumstantially testified that Mrs. Golden did, in that conversation, make to Ownby the several statements which she ignored in her cross examination. Witness, at the time the money was obtained by the defendant, was boarding with Mrs. Weedon, and he never heard that lady threaten to choke her daughter, Mrs. Golden, nor otherwise use any violence to make the latter swear one way or the other. The only complaint he ever heard Mrs. Weedon make of her said daughter was because the latter did not inform her about what the defendant said about getting them out to Texas, and Mrs. Golden excused herself on the ground that she was afraid of Golden, and was unable herself to write, and afraid to tell anyone else, lest he should hear of it.

County Attorney Ownby testified that Mrs. Golden, the night before the examining trial, told him she was afraid of the defendant, and afraid to come into court and testify against him; that she did not think she could ever look at him again, as he had treated her so badly. She asked witness to protect her in court, and not allow the defendant to approach or speak to her.

For the purpose of contradicting or impeaching the testimony of the defendant's wife, the State introduced her written testimony at the examining court. The defendant objected on the ground that his wife was not a competent witness against him. In that testimony she stated that at Memphis, Texarkana, and every city or town at which they stopped on their way to Texas, the defendant locked her up and kept her confined by herself until he returned to her, and when they reached Paris he put her in an upstairs room in a hotel and kept her there all day by herself. When he dispatched to Mrs. Weedon for three hundred dollars, he said he wanted to buy some lands, and when the money was not sent, he said he was going to write for Mrs. Weedon and the rest of the family to come to Paris, so that he

could get their money; that the money was what he was after, and that when he got it he would take witness and go to Dallas. and leave the others. He said he would whip witness if she told what he intended to do. After defendant and witness reached Paris he told her he had deposited in bank the three hundred dollars which her mother and aunts had given her. He showed witness a photograph of a lady and child, and said they were his wife and child, and were in Dallas, Georgia. He asked witness if she was mad about it, and she told him she was. Witness had no friends or acquaintances at Paris or the other places at which she was locked up by the defendant.

On her cross examination, the witness acknowledged that she had told the defendant's mother that she would be willing to leave with him if he got out of this trouble, and that if she had any money she would give it to him to help get out of this trouble. Defendant said that the woman who was his wife in Georgia was a bad and impure woman, and that he had left her and had not heard from her in a long time, and knew not whether she was living or dead. On re-examination, the witness stated that the defendant did not tell her he was going to leave Paris at the time he left, nor did she know he was going away. The witness's testimony at the examining trial contained much other matter, but it is not of a material character.

*Hodges & Allen,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. In this case the indictment contained two counts—one for theft and one for embezzlement of money alleged to be the property of one E. J. Weedon. The conviction was for embezzlement.

There are two bills of exception in the record, but the Assistant Attorney General insists that they cannot be considered, because not filed in the court below within ten days from the conclusion of the trial. They were filed, however, before. adjournment of the term, though when filed more than ten days had elapsed since the trial. Articles 1363 and 1364 of the Revised Statutes prescribe the rules with regard to bills of exception, which apply to both criminal and civil cases. By those Articles it is provided that the bills must be presented "to the judge for his allowance and signature during the term and within

ten days after the conclusion of the trial," and that if a bill be "found to be correct it shall be signed by the judge without delay, and filed with the clerk during the term." It is the presentation of the bill to the judge, and not the filing of the same, which is required to be done within ten days after the conclusion of the trial. If presented within ten days to the judge, then, whenever allowed and approved by him, the bill may be afterwards filed, provided it is filed "during the term." In so far as a different rule is stated in Keeton v. The State, 10 Texas Court of Appeals, 686; Cummins v. The State, 12 Texas Court of Appeals, 121, and Morris v. The State, 17 Texas Court of Appeals, 660, those cases will be overruled. (See R. R. Co. v. Joachimi, 58 Texas, 452; Blum v. Schram & Co., Id., 524; Harrison v. The State, 16 Texas Ct. App., 325.) There had been no adjournment of the court for the term when the bills of exception in this case were "filed with the clerk;" the term was not adjourned until the day following. (Clement v. The State, post, 23.)

By the first bill of exceptions it is shown that the admission of the evidence of the prosecuting witnesses, previously taken and reduced to writing at an examining trial of the case before a magistrate, was objected to because: "First—The witnesses were absent from the State by the aid and procurement of the State's attorney. Second—Because the justice of the peace had failed to write his name across the seal of the envelope containing the testimony. Third—Because the certificate of the justice of the peace failed to show that the evidence had been read over to the witnesses, or that it had been signed by the witnesses as the law requires."

In regard to the ground stated in the first objection, to-wit: that the county attorney had aided and procured means for the witnesses to leave the State, and was instrumental in their leaving—the facts are stated in the bill; and, instead of being in any manner a reflection upon, they are a credit to the humanity and conduct of that officer. The witnesses were two old, and one helpless, females, without husbands or protectors, who had been induced by the wiles of defendant to come from their distant home in North Carolina only to be swindled by him the day after their arrival out of the hard earned means they had been able to lay up during nine or twelve years of constant labor in a factory. Strangers in a strange land, thus helpless and destitute in mid winter when their hapless condition was developed at the examining trial; the county attorney made up the money

to take them back to their old home and friends in North Carolina. This and nothing more. The facts show he was not trying to get them away for purposes of his own. His conduct in doing as he did is in every way commendable, and no blame can attach to him or the State that under such circumstances the witnesses were beyond the jurisdiction of the court at the time of trial.

As to the second objection, the bill of exception fails to furnish any evidence that the magistrate had failed to write his name across the envelope containing the testimony, as is required by law. (Code Crim. Proc., Art. 314; Kerry v. The State, 17 Texas Ct. App., 179.) In the absence of the proof showing the fact to exist, we will presume that the fact could not be established by proof.

The third objection is that the certificate of the magistrate fails to show that the evidence had been read over to the witnesses, or that it had been signed by the witnesses as the law requires. The statute provides that the testimony, after being reduced to writing, "shall then be read over to the witness, or he may read it over himself, and such corrections shall be made in the same as the witness may direct, and he shall then sign the same by affixing thereto his name or mark. All the testimony thus taken shall be certified to by the magistrate taking the same." (Code Crim. Proc., Art. 267.) It is, however, no where required that the magistrate's certificate shall set forth the fact that the evidence was read over to or by the witness. In fact, no particular form is prescribed by law for the certificate of a magistrate to testimony taken before him as an examining court. (Evans v. The State, 13 Texas Ct. App., 225; Hart v. The State, 15 Texas Ct. App., 202; Kerry v. The State, 17 Texas Ct., App., 179; Timbrook v. The State, 18 Texas Ct. App., 1). And the law will presume that such things as are here complained of were done as the law requires or directs, without a certificate to that effect. (O'Connell v. The State, 10 Texas Ct. App., 567.) We find the testimony of each witness is signed as the law requires, and the magistrate certifies to each statement that the same was sworn to and subscribed before him. None of the objections urged against the testimony were maintainable, and the court did not err in admitting it in evidence.

We will consider the second bill of exceptions, which calls in question the correctness of the charge of the court, with the motion in arrest of judgment, which attacks the sufficiency of

the indictment, in so far as it attempts to set forth acts and allegations constituting embezzlement. Upon comparison of the indictment in its embezzlement count with the approved precedent to be found in Willson's Criminal Forms, No. 509, p. 219, and authorities cited, we find a sufficient and substantial compliance with the requisite allegations, and that the charge as therein contained is sufficient for embezzlement.

It was attempted to be shown by the defense that the money obtained from E. J. Weedon, the alleged owner, by defendant, was in fact not her property, but money in her hands justly and properly belonging to the wife of the defendant; and it is contended that a husband can not be guilty of either theft or embezzlement when the property taken or converted by him belongs to his wife.

Upon this phase of the case, the court charged the jury as follows, viz: "If you find that the money described in the bill of indictment belonged to the defendant's wife, Ella Golden, and that said money was voluntarily turned over to the defendant by E. J. Weedon, to be used by him, defendant, then defendant is not guilty of either theft or embezzlement; or, if said money belonged to defendant's wife, and she, his said wife, was entitled to the possession of the same, then defendant would not be guilty; but this rule would not apply if the said E. J. Weedon was entitled to the sole possession of said money." We are of opinion the instruction was correct and properly presented the law on this branch of the case, as applicable to the facts.

But again, it is most urgently insisted that the evidence does not warrant a conviction for embezzlement; that if any offense is established against defendant, it is theft and not embezzlement. We are free to concede that the defendant might have been convicted, under the evidence developed, of theft, by having obtained the money under false pretenses—the pretense being that he wanted to deposit it in bank to secure it for the owner—his intention at the time being to deprive the owner of it and appropriate it to his own use. But the fact that he might have been convicted of theft does not militate against the fact that he might, under the same circumstances, be guilty of the crime of embezzlement. "All authorities treat embezzlement as akin to larceny, and the statutory offense of embezzlement mainly originates in a necessity which resulted from the inapplicability of the common law of larceny to breaches of trust by persons occupying fiduciary relations. Concisely de-

fined, it is the fraudulent appropriation of another's personal property by one to whom it has been intrusted. The fraudulent conversion may be consummated in any manner capable of effecting it; and its commission is a question of fact and not of pleading when the indictment charges that defendant did embezzle, fraudulently misapply and convert to his own use the property entrusted to him. (Leonard v. The State, 7 Texas Ct. App., 418; Cole v. The State, 16 Texas Ct. App., 461.)

Defendant induced Mrs. Weedon to turn over the money to him, ostensibly and with the understanding that he was to deposit the same for her in bank for safe keeping. She intrusted it to him for that and no other purpose. At the very time he obtained it, it is true that to all intents and purposes he was a thief, intending to steal it; but in so far as she was concerned, she was only creating him her agent to take the money for deposit for her to the bank. The trust imposed in him by her was that he would, as her agent, take the money to the bank, and it was intrusted to him solely for that purpose. Instead of complying with the purposes of the trust and his agency, he misapplied, misappropriated, embezzled and converted to his own use the money so confided to him. The evidence makes a most clear and indubitable case of embezzlement, even though it may contain all the essential elements of theft also. It amply sustains the conviction for embezzlement, and we feel fully justified in adding that the facts developed in this record discover as heartless and as inhuman a wrong to obtain money by fraudulent devices as is rarely to be found in the history of crimes unaccompanied by personal violence.

We have found no reversible error in the record, and the judgment is in all things affirmed.

*Affirmed.*

Opinion delivered October 16, 1886.