259 P.2d 785

## STATE v. KONVISER.

No. 5530.

Supreme Court of New Mexico.

July 24, 1953.

C. C. McCulloh and W. R. Kegel, Santa Fe, for appellant.

Joe L. Martinez, Atty. Gen., and W. F. Kitts, Ass't Atty. Gen., for appellee.

SADLER, Chief Justice.

The defendant was charged by information with the embezzlement of property and money in excess of $20 from Miers Johnson while employed as manager of La Caverna Hotel and Bar at Carlsbad, New Mexico, during the period intervening between July, 1950, and February, 1951. In response to a motion therefor by defendant, the State filed a bill of particulars setting up several items as part of a shortage, and separately alleging embezzlement of other specified property. Trial before a jury followed and resulted in a verdict against the defendant. He thereupon prayed and was allowed an appeal to this court for a review of the judgment of conviction pronounced upon him and prayed that his sentence to the state penitentiary be set aside and a new trial granted him.

The employment of defendant, Simon Konviser, as manager of La Caverna Cof-

fee Shop began on July 1, 1950, to which were added his duties as manager of the bar in La Caverna Hotel on September 1, 1950. La Caverna is the name of a leading hotel in Carlsbad. In his management of both the bar and coffee shop, the defendant had some twenty to thirty employees under his supervision. Most of these employees had access to the cash registers, merchandise in the bar and, also, food in the kitchen. The defendant also had a cash change account of $300 turned over to him weekly for which he was responsible. It was for joint use in the bar and coffee shop for making change and the payment of small bills. Once each week, sometimes on Saturdays, at other times the Monday following, a check of the cash in the registers and cash boxes was had at which time an accounting for all cash chargeable to defendant was made.

On February 16, 1951, the defendant was discharged following the discovery that he had mailed to a friend in Los Angeles, California, a package containing some hotel silverware valued at about $8. The package was recovered from the post office before being sent away and was introduced in evidence at the trial and was the subject of one charge of embezzlement of which defendant was convicted.

La Caverna Hotel at all times material was owned by Miers Johnson who had his office in the hotel. The defendant was entrusted with the money and property he was shown to have embezzled while acting as manager of La Caverna Coffee Shop and Bar, as above stated. His discharge took place on a certain Friday and the cash register was found to be short between $70 and $80, to-wit, the sum of $79.55, which defendant promptly restored to the account. The verdict of guilty returned against defendant embraced a conviction of him for having embezzled this amount.

In addition, the defendant was shown to have purchased a typewriter which was delivered to him while on duty with a C.O.D. ticket for $65.50 due on the typewriter and freight charges of $5.37, making a total of $70.87 which the defendant took from the cash register in La Caverna Coffee Shop and paid to the motor freight agent delivering the machine. The verdict of guilty returned against defendant of having embezzled money and property in excess of $20 embraced a conviction of having embezzled the item of $70.87 mentioned above.

It is also claimed by the state and evidence was introduced to support the charge that defendant over the period of his employment had embezzled approximately $8200 in money from the bar and coffee shop as shown by an audit prepared by a firm of auditors covering the period from April 1, 1950, to February 24, 1951, just one week subsequent to defendant's discharge. This evidence, however, was in the nature of a so-called "adjusted" shortage estab-

lished by a comparison of business for earlier periods with business over the period of defendant's employment. Thus, assuming that had business continued the same, or substantially so, the difference between what it actually was and what it would have been had it continued the same, represented the shortage of approximately $8200 which defendant was found guilty of embezzling.

▄ The first point relied on for reversal poses the question whether the books and records of the employer are admissible against the employee under the Model Act, or by the same token, whether audits derived therefrom may be put in evidence. The objections forming the basis of this claim of error go chiefly to State's Exhibit No. 24, and testimony concerning same, being an audit based on books of the employer for certain periods prior to defendant's employment, and percentages of business thus established projected over the time of defendant's employment. The State relies on such cases as U. S. v. Kelley, 2 Cir., 105 F.2d 912, and State v. Hayes, 127 Conn. 543, 18 A.2d 895, while defendant would apply the rule approved in People v. Lewis, 294 Mich. 684, 293 N.W. 907. We need not determine the question, however, because of our conclusion that employment by the prosecution of State's Exhibit No. 24 and of testimony deduced therefrom was improper and highly prejudicial. It alone constitutes grounds for reversing the judgment against defendant and the award of a new trial. It is worth noting, however, that in applying the Model Act, 1941 Comp. Sec. 20–219, L.1945, c. 15, in Reinecke v. Mitchell, 54 N.M. 268, 221 P.2d 563, 21 A.L.R.2d 770, a civil action, we cited as supporting authority along with several civil cases, Landay v. United States, 6 Cir., 108 F.2d 698, an appeal in a criminal case.

As his second point the defendant challenges sufficiency of the information to charge embezzlement in that, as argued, it omits the essential element of "entrustment." The defendant's counsel say this point involves a jurisdictional question raised here for the first time. The charge is based on 1941 Comp. Sec. 41–4524, mentioned in the information. Counsel insist that since L.1949, c. 33, specifically repealed 1915 Code, Sec. 1543, of which they say 1949 act is a substantial reenactment, and did not repeal 1915 Code, Sec. 1544, the latter is still in effect (State v. Prince, 52 N.M. 15, 189 P.2d 993) and that the charge against defendant should have been one of larceny under it rather than embezzlement under 1941 Comp. Sec. 41–4524, L. 1949, c. 33, the element of "entrustment" being absent.

▄ We agree with the Attorney General that the factor of entrustment is sufficiently charged and shown. As pointed out by him the mere fact that one is an agent, servant or employee does not deny that "entrustment" may characterize the

custody of money or property in his possession as such agent, servant or employee. The powers of defendant as manager were broad and extensive and the evidence amply supports the jury in believing and finding "entrustment" characterized defendant's custody of the money and property embezzled. The point urged lacks merit. Equally unavailing is counsel's insistence that the information fails to charge the essential elements of embezzlement by omitting entrustment as a factor. It expressly charges the offense of embezzlement was committed contrary to the provisions of Section 41–4524, which makes entrustment the stepping stone to commission of the crime. 1941 Comp. § 42–607(2).

The counsel for defendant has raised several points on which he predicates error in relation to the silverware. First he says the proof showed a different offense, to-wit, larceny, rather than embezzlement and, second, that there is an absence of substantial support in the evidence to show commission of the latter offense as to the silverware. There is no merit to either contention. Counsel argue that if the fraudulent intent to convert was present at time of the entrustment, viewing the State's testimony in one aspect, then the crime is larceny. He was shown by State's testimony to have mailed the package very soon, the same day, and only a few hours after obtaining it from the hands of the secretary and bookkeeper of the owner, who took it from the safe. But the defendant said several days intervened between the two events. The evidence was in conflict and the jury had the right to take defendant at his word. State v. Greenlee, 33 N.M. 449, 269 P. 331. It could have believed the fraudulent intent to appropriate the silverware to his own use was formed later.

Moreover, it would not be fatal to conviction under the statute, resting on entrustment, as it does, that the fraudulent intent existed or was formed coincidentally with receipt of the money or property. Wall v. State, 2 Ala.App. 157, 56 So. 57; Golden v. State, 22 Tex.App. 1, 2 S.W. 531; Brown v. State, 99 Tex.Cr.R. 441, 270 S.W. 179; Alvarez v. State, 109 Tex.Cr.R. 62, 2 S.W.2d 849; State v. Fink, 186 Mo. 50, 84 S.W. 921; Lewis v. People, 109 Colo. 89, 123 P.2d 398. The defendant must fail in both contentions urged in this connection.

Nor do we see any error as to various points urged as to embezzlement of the $79.55 from the cash change account or the $70.87 from the cash drawer to pay for a Corona typewriter ordered by the defendant personally. Counsel for defendant challenges sufficiency of the evidence to support the verdict as to each of these items in the bill of particulars. We think it is sufficient as to each and it was for the jury to evaluate it. We can not disturb its verdict

as to these charges. They alone would support the sentence imposed; if we could feel assurance it would be the same, even though the jury had not been permitted under the evidence to find defendant guilty of embezzling a sum in excess of $8200. This is a conviction which the State strongly contends is within the verdict rendered, an assertion with which we readily agree.

There is little need to spend much time on this last mentioned phase of the case. The State seeks to uphold the conviction, though necessarily agreeing the audit report employed to such deadly effect at the trial was the major factor in defendant's conviction. That the proof of the large shortage of which defendant stands convicted of embezzling rests solely on a projected shortage deduced from comparison with previous years' business can not be questioned. A few quotations from the record will suffice to show this fact.

The auditor testified:

"Q. (By Mr. Reese) I show you what has been marked as State's Exhibit 24 and ask you if that is the report you made from your audit? A. Yes, sir, it is.

"Q. Now, are the figures used in this audit purporting to be the actual figures; are they taken from the original records? A. With the exception of one schedule, they are all taken from the original records.

"Q. Now, what is that schedule, Mr. Grimland? A. In that schedule, I took the cost of sales and—as taken from the original records, and increased them to show a gross receipts figure which was in excess of that shown by the original records.

"Q. Which schedule is that? A. That is in schedule three. That would (be) schedule three.

"Q. And other than the estimated gross receipts in schedule three, all of the balance of the figures of operating expenses, profits and sales are taken from the original records of the hotel and the other businesses? A. Well, on that page for sales which is gross receipts, there are two figures, one is a total and two figures besides that and one of those figures is actual and the figure that is an adjusted figure would be this figure shown for the period July 1, 1950 to February 24, 1951. Outside of that, all figures in that schedule are actual figures taken from the books." (Emphasis ours).

A little later on, the auditor further testified:

"Q. Let's go back to the $40,950.86 item and explain the basis of that figure, please sir? A. In the report, I have summarized and this is taken from end of the year reports that I have made for Mr. Johnson for the

three years involved which are the same figures that are used in the federal income tax returns for those years. I have summarized the per year receipts and the per year cost of sales and arriving at his percentages on those years, I know what the restaurant has been doing. For the year '47-'48, his food costs were 48 percent of sales. For the year '48-'49, his food costs were again 48 percent. For the year '49-'50, his food costs were 49 percent. For the year '51 taking the book figures which are the figures that are on the books, there was a 59 percent food cost which were ten percent higher than the highest of the previous year and is a very bad food cost. So, we have applied the highest prior year average food cost which is 49 percent and incidentally that is what the restaurant is doing now approximately 49 percent and applied that to the food costs by dividing the food costs by 49 percent or by 49 and multiplying by 100 which gives then the figure that you would have taken in to have had a 49 percent food cost and *I use that as my basis for determining the amount of funds that in my opinion were not reported.*" (Emphasis ours).

\*   \*   \*   \*   \*   \*

"Q. Now, the figure of 49 percent food costs, that is the figure that you arrived at? A. By taking the highest figure that the restaurant had shown for the three years prior to the current year or the year under discussion.

"Q. And with that figure, you *arrived at the figure of $8,249.53 that he was short?* A. *That is correct.*" (Emphasis ours).

The intricacy of the calculations made by the auditor in setting up the shortage with which defendant is charged and of which he was convicted, is reflected by these extracts from his testimony, to-wit:

"Q. Now, referring to your statement that you have assumed that Mr. Konviser was probably a better operator and that wouldn't have anything to do with it, I call your attention to schedule four. For the years 1949-'50, or perhaps I should say for the year of 1949-'50, you show an operating expense of 68 percent. Then immediately to the right of that, during the period April 1, 1950, if I am correct, to February 24, 1951, you show an operating expense of 72 percent. Does that indicate that Mr. Konviser's operations were so substantially more efficient and—than his predecessor's as to cut the loss down from 16 to 8 percent? A. Your percent now are not whole figures. In other words, your 68 percent is a fifty-thousand dollar figure where your 72 percent is a

forty-eight thousand dollar figure. If you want to show that, you will move your thirty-five thousand dollar figure over to the past year and you will find that the percentage will be approximately the same as the prior year which would be 68 percent.

"Q. And yet the percentage being the same, you still figure that the loss should only be half as much? What I am trying to figure out, Mr. Grimland, is this: You are assuming that, getting down to basic facts, the main worry of a business is whether it is operating at a profit or a loss or whether the profit and loss is improving or becoming worse. We have operating expenses which you have stated remained about the same percentage. We have prior to Mr. Konviser's coming there a 16 percent loss and yet you assume that he should operate with only an 8 percent loss. A. All right. Now, let's go back and clarify the two figures you are using there now. We would have to—You are talking about one thing which is a three months' figure of $15,922, and then you are talking about another one which is many months more and what you want to do now when you are talking about percentages is to convert a number of days, one figure, as a per day against another per day and then you can come out with your figure which will

more or less give you the story; on the two figures you are using, they are just percentages, but they aren't percentages of the same thing, so of no value for comparison purposes.

"Q. All right. Let's compare percentages then, actual percentages? A. Well, it would take a calculator to do it or it would take me about 15 minutes to do it.

"Q. *You didn't prepare these percentages? A. No sir, I didn't, and I know from my experience with figures that it won't give you a favorable picture of what you are getting at.*

"Q. I still don't feel, Mr. Grimland, at least to my satisfaction you have answered my question as to why you assumed that the loss should only be 8 percent. A. Well, I answered to the best of my ability when you first asked that question, by stating that. Now, I can answer the argument that you brought up last if you will give me a few minutes to work it out, but to get back to your original question, now. I stated to you at the very beginning that the operating expenses and the resulting figure there was immaterial as far as determining any shortage and that is the primary thing I am concerned with is not how economical either one of them operated. I am just assuming that Mr. Konviser

was at least as economical as anyone else; that being the case, he should have received some $40,000.00 which is based on cost of sales or the food that went through the kitchen and was used and the food that was set on the tables.

"Q. Now, in the prior year, referring to schedule four, there was a 17 percent net loss, is that correct? A. That is correct.

"Q. And now, to go back and clarify something else. According to your audit figures, this restaurant has never operated at a profit during the time— A. Not during the four years involved in this report.

"Q. And the great increase in loss occurred during the fiscal year 1949–'50, is that correct? A. There was a decrease in receipts that year which correspond to the increase in loss.

"Q. That percentage being three percent to '47–'48, '48–'49, and then 17 percent? A. Yes sir.

"Q. In '49–'50? A. Yes sir, and a 31 percent in '50–'51."

\* \* \* \* \* \*

"Q. *Now, what other item might have caused the 59 percent figure during the month of May, 1950, that you can think of?* A. *Well, let me speak just what could cause that figure in general.*

"Q. *Well, let's take one thing at a time.* A. *It could be a shortage of receipts turned in. It could be an error in taking the inventory. It could be theft of merchandise out of the kitchen.*

"Q. Now, let's take that theft of merchandise out of the kitchen. Would that be equally as applicable throughout the entire period? A. That would apply in any case. I am just speaking in general.

"Q. In other words, this shortage or apparent shortage, I believe you characterize in your audit is something that does not necessarily mean that the entire amount of that shortage or any specified amount of that shortage is due to money actually collected from customers and put in someone's pocket, a certain percentage of that can be due to incorrect inventories, is that correct? A. I am not going to say that the statement is correct as to the period on the board.

"Q. Can you say that it is not correct? A. Would you restate your question, please?

"Q. A certain percentage of the so-called shortage which you have stated exists if it did could be due one to incorrect inventories? A. That is correct.

"Q. Two, it could also be due to theft of merchandise throughout the

period? A. Speaking in general, yes, that is true. Now, I have made the statement previously that I am satisfied professionally in my own mind with the inventories or they are acceptable to me both ·at the beginning and end of the period but academically speaking—

"Q. You haven't checked those against the actual invoices? A. No sir, but—

"Q. You can't testify of your own knowledge—

"Mr. Reese:—I would like to let the witness answer the question.

"The Court:—Overruled. He was wandering on after he answered the question. He is continuously going on after he answers the question. Stay with the answers, Mr. Witness.

"Q. (By Mr. Kegel) You can not of your own knowledge, Mr. Grimland, testify as to the correctness of the closing inventory then? A. No sir.

"Q. Or any other inventory during that period? A. No sir.

"Q. You didn't take any of those inventories yourself? A, No sir." (Emphasis ours).
And, finally:

"Q. Actually then, Mr. Grimland, this amounts to—your second column on the blackboard in which you figure there is a shortage of some eighty-two hundred dollars, is based upon the assumption or the assumptions I should say, that first the beginning and closing inventories were correct? A. Yes sir.

"Q. Two, that there was no theft or loss of merchandise in the kitchen or elsewhere? A. Yes sir.

"Q. Three, that during a period of rising prices, the menu prices kept pace with the increase in the price of food, and four, that Mr. Konviser was able to operate as efficiently as his predecessors? A. Correct.

"Q. Now, if those items are so,. then the shortage is as indicated? A. Yes sir.

"Q. Is that correct, to the extent that any one of those items may be wrong or may intervene? A. Could either raise or lower it.

"Q. The shortage could be increased or decreased accordingly? A. Yes sir.

"Q. And you have no personal knowledge of the effect of those items mentioned, is that correct? A. No personal knowledge, no sir.

"Mr. Kegel:—Your witness."

We think enough is quoted from the testimony of the auditor relative to the manner in which a projected shortage was imposed on defendant of more than $8200 to demonstrate its utter unreliability as competent testimony or documentary evidence on which to sentence an accused to a term in the penitentiary. The expert witness continually spoke of the column representing the reflected embezzlement as an "adjusted" shortage. Attorneys for the defendant more accurately, we think, denominated it a "speculative" shortage. To our minds, the method chosen of proving defendant's guilt violates all traditional protections against conviction by speculation and guess work. The defendant is entitled to a new trial and will be awarded one. If on it more reliable proof of this item of the charge cannot be furnished, it should be dropped. The judgment will be reversed and the cause remanded to the district court with directions to set aside its judgment and award defendant a new trial. Other claims of error not expressly mentioned have not been overlooked but are deemed without merit.

It Is So Ordered.

McGHEE, COMPTON and SEYMOUR, JJ., concur.

LUJAN, J., not participating.