414 P.2d 858

STATE of New Mexico, Plaintiff-Appellee.

v.

Joe E. SNEED, Defendant-Appellant.

No. 7996.

Supreme Court of New Mexico.

May 31, 1966.

J. Wayne Woodbury, Silver City, for appellant.

Boston E. Witt, Atty. Gen., James V. Noble, Roy G. Hill, Asst. Attys. Gen., Santa Fe, for appellee.

## OPINION

WOOD, Judge, Court of Appeals.

Defendant was convicted of murder in the first degree and, upon the jury's recommendation, was sentenced to life imprisonment. The appeal raises three issues: unlawful search and seizure, improper comment to the jury and erroneous admission of evidence.

The claim of unlawful search and seizure is based on amendment IV of the Constitution of the United States and art. II, § 10 of the Constitution of New Mexico. The issue was presented to the trial court by a motion to suppress two items of evidence obtained by the police in a search of defendant's car. The police did not have a search warrant, and did not arrest defendant until three days after the search. The state contends that defendant consented to the search. The trial court, after a hearing at which the defendant testified, denied the motion. In doing so, the trial court commented that defendant had been overly-cooperative with the police and had willingly acquiesced to the search.

After defendant discovered the bodies of his parents and the police had started their

investigation, he went to the home of relatives. Later on the same morning, he went to the police station, for questioning, at the request of the police.

Officer Ingram testified that defendant was advised that he did not have to answer questions; that defendant indicated that he would like to find out who did it and would cooperate all he could. The officer characterized defendant as being very cooperative. The officer further testified that defendant was worried about his car and asked the officer if there was some way the police could bring it to him. The car had been left, locked, at the home of the defendant's parents.

During the questioning, Officer Ingram received a telephone call from the chief of police. After this call:

"I went and told the Defendant, Joe Sneed, that if I could have his keys to bring his car down to City Hall and also that we would like to search it and he willingly reached in his pocket and handed me the keys."

Defendant agreed that he had been worried about his car and that he handed the keys to the officer when asked for them. Defendant denied that the officer asked for permission to search the car or that he gave permission for a search.

The questioning of defendant lasted from one to one and one-half hours. Three officers participated in the questioning. Officer Garcia began the questioning, but had to leave. Defendant testified that Officer Garcia was his friend. Officer Ingram questioned defendant after Officer Garcia left. Officer Tow, also a friend of defendant, asked a few questions. The questions to defendant were general—the police were looking for a clue.

■ A search and seizure may be made without a search warrant if the individual freely and intelligently gives his unequivocal and specific consent to the search. The consent is not voluntary if it is the product of duress or coercion, actual or implied. The consent must be proven by clear and positive evidence and the burden of proof is on the state. State v. Herring, No. 7977, filed May 31, 1966.

Application of this rule results in some apparently conflicting decisions. Higgins v. United States, 93 U.S.App.D.C. 340, 209 F.2d 819 (1954); United States v. Dornblut, CCA 2, 261 F.2d 949 (1958); United States v. MacLeod, CCA 7, 207 F.2d 853 (1953); Channel v. United States, 285 F.2d 217 (9th Cir. 1960). We do not attempt to reconcile the above cases, since the present case differs from each of them.

■■ The question of whether consent has been given is a question of fact subject to the limitations of judicial review. Villano v. United States, CCA 10, 310 F.2d 680 (1962). Each case must stand or fall

on its own special facts, and in the trial court's judgment of the credibility of the witnesses. United States v. Dornblut, supra.

■ The circumstances of the claimed consent were presented to the trial court. We decline to hold, that as a matter of law, the trial court was in error in denying the motion. We hold against defendant on the claim of unlawful search and seizure.

■ There was improper comment to the jury. In closing argument the district attorney and his assistant commented on defendant's failure to testify. This can no longer be done. State v. Miller, 76 N.M. 62, 412 P.2d 240; and State v. Flores, 76 N.M. 134, 412 P.2d 560.

Defendant claims that the testimony of Dr. Thorp was erroneously admitted.

There was testimony that defendant had used the name "Robert Crosset" at Yuma, Arizona, and at Seaside, California, within a week prior to the murder on the night of August 17, 1964.

On the morning of August 17, 1964, someone purchased a .22 hand gun from a store in Las Cruces, New Mexico. The store kept a register of sales of hand guns. For the sale on August 17, 1964, the register showed: Robert Crosset, Box 210, Las Cruces, 5 feet 9 inches, brown hair and brown eyes. The register is exhibits 32 and 33.

A professor of mathematics, Dr. Edward O. Thorp, was called as a witness by the state. He testified as to a "law of probability" as follows:

"\* \* \* if you have several events which are independent \* \* \* and then if you estimate the probability of each of those events, and multiply these numbers together, then you get a good idea of the probability of them all happening. \* \* \*"

Independent events were defined as seemingly unrelated events. The "probability of them all happening" meant the chance of their happening at one and the same time.

For one set of numbers, Dr. Thorp examined telephone books from various western communities, estimated that the books contained 1,290,000 names and found that the name Crosset did not appear. He found that the name Robert appeared about once in 30 names. From this, his "estimate of probability" was that the name Robert Crosset would appear once in 30,000,000 names.

For his second set of numbers, Dr. Thorp used exhibits 32 and 33. He testified that there were 35 listings and 12 of the listings were "brown-brown," meaning color of eyes and hair. He stated that 12 of the 35 entries showed a height between 5′ 8″ and 5′10″. From these his "estimate of probability" was one in eight for a combi-

nation of brown hair, brown eyes and a height between 5′ 8″ and 5′ 10″.

Dr. Thorp testified that the probability of two people at random choosing the same post office box number from a thousand numbers was one in 1000.

After estimating these probabilities, the multiplication result was one in 240 billion. The significance of this figure, according to Dr. Thorp, was a chance of 240 billion to one:

"* * * that it was our suspect who was responsible for this series of numbers in the pawnshop, as opposed to some person coming in and accidentally implicating him. This is the application of this thing to criminalistics."

The problem is in determining when a scientific principle is sufficiently developed to be used in evidence. In State v. Trimble, 68 N.M. 406, 362 P.2d 788, we declined to admit the results of a polygraph test. In State v. Lindemuth, 56 N.M. 257, 243 P.2d 325, evidence obtained by use of sodium pentathol was held inadmissible.

Here we are asked to approve the use of mathematical odds as evidence to identify the defendant as the one purchasing the gun, that is, that the oods, in themselves, are evidence of identification.

The inference to be drawn from Dr. Thorp's testimony was that the defendant was the one who purchased the gun, and not any other person. This inference is based on the 240 billion to one probability (or chance) calculated by Dr. Thorp. The validity of this chance depends on the validity of the estimates made concerning the telephone books, exhibits 32 and 33 and the selection of one number out of a thousand numbers.

Dr. Thorp explained how these estimates were made and testified that he had used conservative estimates. He also testified that "one might argue about these numbers and what they mean." When asked if he were testifying "that these are incontrovertibly the chances that were present," his answer was "No."

Dr. Thorp did not testify as to why these particular items were chosen on which to base his estimates. Nor did he state why a positive number was used in arriving at an estimate on the basis of the telephone books when the name Robert Crosset was not listed in those books. Since the name Robert Crosset did not appear, should any estimate, based on the telephone books, be used at all? Or should a zero be used as the estimate based on the telephone books? Why did Dr. Thorp base his estimates on 35 listings in exhibits 32 and 33 when there are only 10 listings on those exhibits?

The basis for using the telephone books and the 35 listings may be common knowledge to the mathematician, but this basis is not explained in the record, and it is not

**354**

of such common knowledge that we can take judicial notice of such basis.

█ Certain scientific principles are now used in evidence that were not formerly admissible. But such principles were not used until their validity was demonstrated and accepted. Ballistic tests are now admissible; however, "this general truth was until recently unknown and disputable; judicial opinion now recognizes it as a conceded fact of which judicial notice may be taken." State v. Martinez, 52 N.M. 343, 198 P.2d 256.

Here we are required to speculate as to the validity of the estimates made by Dr. Thorp. Such speculation is similar to that condemned in State v. Konviser, 57 N.M. 418, 259 P.2d 785. There, proof of a cash shortage was arrived at by comparing business prior to defendant's employment with business during his employment. This court said:

> "The expert witness continually spoke of the column representing the reflected embezzlement as an 'adjusted shortage.' Attorneys for the defendant more accurately, we think, denominated it a 'speculative' shortage. To our minds, the method chosen of proving defendant's guilt violates all traditional protections against conviction by speculation and guess work."

█ We hold that mathematical odds are not admissible as evidence to identify a defendant in a criminal proceeding so long as the odds are based on estimates, the validity of which have not been demonstrated.

The cause is reversed with directions to award the defendant a new trial and at said trial to proceed in accordance with the opinions expressed herein. It is so ordered.

CHAVEZ, NOBLE, COMPTON and MOISE, JJ., concur.