## 66702. GRAHAM v. THE STATE.

BANKE, Judge.

The appellant was convicted of rape, aggravated assault, aggravated sodomy, and burglary. An expert witness testified concerning the identification of blood samples based on a procedure known as electrophoresis. In his sole enumeration of error, the appellant complains that the trial court erred in allowing the witness to testify concerning the statistical or mathematical probability of certain enzymes being found in the blood of the general population. The witness testified that his statistics were derived from some 2,000 blood samples seen in his lab over a period of time and that his statistics coincided with those provided by other crime laboratories, including that of the Federal Bureau of Investigation. *Held:*

"The opinions of experts on any question of science, skill, trade, or like questions shall always be admissible; and such opinions may be given on the facts as proved by other witnesses." OCGA § 24-9-67 (Code Ann. § 38-1710). The testimony complained of was clearly within the area of the witness' expertise, and the appellant's objection to it went to its weight rather than its admissibility. See generally *Jenkins v. State,* 156 Ga. App. 387 (274 SE2d 618) (1980); *Breland v. State,* 134 Ga. App. 259 (214 SE2d 186) (1975).

*Judgment affirmed. Carley, J., concurs in the majority opinion only. Deen, P. J., concurs specially.*

DECIDED SEPTEMBER 14, 1983.

*John F. Nebl,* for appellant.
*Robert E. Wilson, District Attorney, Robert E. Statham III, Assistant District Attorney,* for appellee.

DEEN, Presiding Judge, concurring specially.

The majority opinion is correct in recognizing that this court has approved the admissibility of expert testimony in the field of electrophoretic serology. Caution, care and concern must be observed in two areas of serology statistics through mathematical probability.

I

*Fresh Blood — Dried Blood, and Standard Deviation Analysis:*

Electrophoresis is a "physical method for the separation of biologically important proteins through the use of electric current. . . [Protein] molecules are placed on an appropriate medium and subjected to an electrical field, [thus] migrat[ing] toward the pole of the opposite charge. Blood proteins [because they] vary in size, shape, and density and charge. . .[also] vary in electrophoretic

mobility. Therefore, after electrophoresis, they are separated into distinct bands on the supporting medium." Jonakait, *Will Blood Tell? Genetic Markers in Criminal Cases,* 31 Emory L. J. 833, 912 (1982). Electrophoresis has also been simply defined as "the detection of genetic markers" in dried blood. *Id.* at 841.

The question that weighs heavily throughout the present case is whether evidence in the form of dried blood is scientifically verifiable by experts in the field of electrophoretic serology. Although electrophoretic serology has been recognized by this court as a proper means of identifying properties in blood (see *Jenkins v. State,* 156 Ga. App. 387, 388 (274 SE2d 618) (1980)), and although its reliability in the testing of *fresh* blood has also been endorsed as scientifically reputable, the issue remains: May new techniques of testing *dried* blood, which have not been implemented in field tests, receive the same credibility as those already associated with the testing of *fresh* blood?

The test normally applied to the admissibility of new scientific evidence is found in Frye v. United States, 293 F. 1013 (D. C. Cir. 1923). "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define . . . [W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* at 1014.

This test from Frye, though somewhat vague, appears at first blush to have been met in the present case, but closer scrutiny of electrophoretic testing is not altogether satisfying. "*Frye* rests on the notion that science is a never-ending construct," upon which contributors build. Jonakait, supra, at 846. It also involves a three-part process: (1) development of a procedure; (2) testing of results; and (3) general application of results. Jonakait disapproves of electrophoretic serology in terms of dried blood examination because it does not meet either step 2 or step 3 of Frye. Jonakait notes that electrophoretic serology (and forensic serology in particular) is a highly specialized field and thus is not accessible to widespread testing within the scientific community. In speaking to both points two and three of the Frye test, he points out that the narrowness of the field runs contrary to the thorough testing of the results (step 2 of Frye), and, most importantly, defeats the general application of the results (step 3 of Frye). Forensic serologists, he asserts, are usually law enforcement officials, thus making the results of those engaged in such work tainted, but nonetheless highly susceptible to judicial recognition. The one dimensional composition of forensic serology

(only law enforcement officials participate in it) also makes next to impossible the defense attorney's task of rebutting successfully the reliability of judicially acceptable expert testimony in this field. Thus, the burden of proof appears to be placed on the defense attorney to show unreliability of evidence rather than upon the state to first demonstrate reliability. See People v. Young, 106 Mich. App. 323 (308 NW2d 194) (1981); People v. Barbara, 400 Mich. 352 (255 NW2d 171) (1977); State v. Washington, 229 Kan. 47 (622 P2d 986) (1981). Jonakait recommends that in accordance with Frye, serologists do extensive field research with dried blood so that their results will reflect the age of the blood and various conditions under which blood becomes altered.

The main criticism that Jonakait makes is that the scientific reliability of a highly technical procedure cannot be discovered in a self-contained field composed only of specialists who are doing the bidding of law enforcement officials. The tripartite test of Frye cannot be met as to parts 2 and 3 unless the data is tested impartially and with general (scientifically verifiable) application.

In addition to the above criticism of forensic serology, the serologist who testified in the instant case seems to have exceeded the scope of his expertise in his announcement of statistical data concerning the defendant. By ignoring the need to insert a standard deviational computation as to events occurring by chance or design, the expert, in his determination that only 33 out of 10,000 people had blood properties like those of the defendant, failed to give an accurate depiction of the defendant's connection to the crime. The defense attorney, on the other hand, could have insisted that a professional statistician be called in to verify the findings of the serologist vis-a-vis the general population. Additionally, the witness derived the 2,000 blood samples from whole or fresh blood, while as to the case under consideration, we deal with dried blood as well as fresh. See *Statistics in the Law: Potential Problems in the Presentation of Statistical Evidence,* 40 Wash. & Lee L. Rev. 313, 325 (1983), as to statistics used in standard deviation analysis, the results which when properly utilized will often determine whether the actual events occurred by chance or by design. The leading case on standard deviation analysis is Castaneda v. Partida, 430 U. S. 482 (97 SC 1272, 51 LE2d 498) (1977).

In discussing the scholarly analysis of some of the reservations raised in the summary by Jonakait, Frye was quoted generally because of the reference to that case in his comments and analysis. Georgia has not adopted the Frye rule. "[W]e conclude that the Frye rule of 'counting heads' in the scientific community is *not* an appropriate way to determine the admissibility of a scientific

procedure in evidence." *Harper v. State,* 249 Ga. 519, 525 (292 SE2d 389) (1982). (Emphasis supplied.) The Supreme Court of Georgia in the latter cited case gives the trial judge a broad discretion in deciding whether the procedure or technique in question attains or reaches a scientific stage of verifiable certainty to qualify it for admissibility. The trial court may consider: (a) expert testimony; (b) exhibits; (c) treatises; (d) rationale of cases in other jurisdictions; and (e) that it rests upon the laws of nature. "The significant point is that the trial court makes this determination based on the evidence available to him rather than by simply calculating the consensus in the scientific community." *Id.* at 526. When a substantial number of courts adopt the reception of particular scientific evidence, judicial notice may thereafter be taken of this. Compare *Thornton v. State,* 161 Ga. App. 296, 299 (287 SE2d 749) (1982), and cases cited therein.

It should be further noted that Footnote 10 in *Harper* discusses the *Jenkins* case, which is primarily relied upon by the majority opinion in the instant case. The footnote in part states: "We are unable to determine from the Court of Appeals' opinion whether the reliability of the electrophoresis procedure was sufficiently proven at trial. Therefore we are unable to agree with defendant that the Frye rule had heretofore been modified to allow an expert opinion on a scientific procedure which the trial court has not determined to be verifiably certain." *Harper* supra at 525, fn. 10. In the instant case, the record reveals the trial court did go in depth into the reliability of electrophoresis procedure.

See Berry v. Chaplin, 74 Cal. App. 2d 652 (169 P2d 442) (1946), involving Charlie Chaplin and Joan Berry with the recent case of O'Bannon v. Azar, 9 Fam. L. Rep. 2606 (La. Ct. App. 1983).

## II

*Use of Statistical and Mathematical Probability of Bayes' Theorem:*

Courts must likewise use caution, care and concern when extrapolating possibility results in criminal cases based on mathematical and statistical probability. "Mathematics, a veritable sorcerer in our computerized society, while assisting the trier of fact in search for truth, must not cast a spell over him." See People v. Collins, 66 Cal. Rptr. 497 (438 P2d 33, 36) (1968) (prosecution attempted to prove identity in robbery case by totaling characteristics of defendant couple to show improbability of another couple possessing identical characteristics). See also attached appendix. In the latter case the expert witness listed certain characteristics and certain individual probabilities:

| *Characteristic* | *Individual Probability* |
| --- | --- |
| A. Partly yellow automobile | 1/10 |
| B. Man with mustache | 1/4 |

C. Girl with ponytail    1/10
D. Girl with blond hair    1/3
E. Negro man with beard    1/10
F. Interracial couple in car    1/1000"

The court then stated: "In the instant case, therefore, because of the aforementioned two defects — the inadequate evidentiary foundation and the inadequate proof of statistical independence — the technique employed by the prosecutor could only lead to wild conjecture without demonstrated relevancy to the issues presented."
Compare: Sartorius, *Bayes' Theorem, Hard Cases, and Judicial Discretion,* 11 Ga. L. Rev. 1269 (1977), and D'Amato, *Can/Should Computers Replace Judges?,* 11 Ga. L. Rev. 1277 (1977).

In State v. Sneed, 76 N.M. 349 (414 P2d 858, 862) (1966), the court reversed a conviction based on probabilistic evidence, stating: "We hold that mathematical odds are not admissible as evidence to identify a defendant in a criminal proceeding *so long as the odds are based on estimates, the validity of which have [sic] not been demonstrated.*" (Emphasis supplied.) See Kingston and Kirk, *The Use of Statistics in Criminalistics,* 55 J. Crim. L., C. & P. S. 514 (1964).

In Lauter, *Paternity: The Final Word,* Nat'l L. J., Sept. 12, 1983, at 1, 27-28, col. 1, Bayes' Theorem and genetical analysis in blood tests are discussed. On page 28, Maryland's Judge Ross is quoted: " 'The statisticians have explained it to me at least 50 times, and I always understand it when they do.' Once the explanation is over, however, 'I can't explain it to anyone else.' " If Judge Ross can understand it, the jury of non-experts should also be able to handle it. Non-expert jurors are generally the best judges of differing expert testimony. However, it is important that the jury understand whether the data submitted to them is factually supported or, on the other hand, is just a speculative estimate. If we have known existing facts, then we do know that experts can then extrapolate mathematical and statistical probabilities of what *might* be true, or not true, in the past and future. The jurors must be in position, particularly in criminal cases, to make an intelligent and informed evaluation of the reliability and value in their acceptance or rejection of the statistical probabilities projected to prove a point.

In the instant case, underwear (presumably the defendant's) was found near the victim's residence; it was shown that the defendant owned a sweater similar to the one found beside the victim's bed; and the defendant's blood type matched that of some of the blood found in the victim's bed. This circumstantial evidence in its totality serves to uphold the verdict. Therefore, with the stated

comments and reservations, I concur.