William Kapelmatt, J.
A ¡hearing was conducted during trial, in the absence of the jury, on the issue of the competency and reliability of proffered scientific evidence and its admissibility, more specifically, of certain test results stemming from an examination of white blood cells and epithelial squamous cells retrieved from 'the defendant’s jacket 22 months iatfter the police had seized it. The People contend that the examination of the nuclear sex (chromatin material of these cells reveals that these cells are of female origin.
The People urge its acceptance as relevant because the murder victim was a female with type 0 blood and the defendant is a male with type 0 blood. The blood on the jacket was type 0. The People submit that the proof as ¡to the sex of the white blood and epithelial cells found in the defendant’s coat connects the defendant to the commission of the (crimes and negates statements made iby him that the blood stains were produced when the defendant injected himself with narcotics and was his blood. The People, to prove this allegation, contend that .the test itself has acceptance in the scientific ¡community and that the test and its results are reliable.
This court, in its research, and counsel in their research, were unable to find a single reported case in the United States determining the admissibility of tests conducted to determine the sexual origin of human white blood cells and human epithelial *1079 cells by the recognition and evaluations of sex chromatin in the cell nuclei in aged dried blood. This case then is one of first impression.
On the issue of the competency of the evidence, the People called Dr. Thomas T. Noguchi, ¡Chief Medical Examiner of Los Angeles, California, and Dr. Omar -S. Alfi, Director of the Cytogenetics Laboratory of Children’s Hospital, Los Angeles, California. The defendant called Dr. Donald Briggs, assistant professor of medicine at New York University, specializing in hematology and genetics, Dr. Body Cox, professor of medicine at New York University and director of its division of human genetics and Dr. Alexander :S. Weiner, the Chief Serologist for the City of New York since 1938 and a specialist in serology and immunohematology.
Dr. Thomas T. Noguchi, an expert in forensic pathology and m sex identification of chromatin material in cells, testified that cell nuclei from human fresh blood or tissue have been examined numerous times to determine its sex origin. He further testified that such determinations are accepted in the scientific community and that the three techniques utilized are: (1) the F or Y body test; (2) the drumstick test; and (3) the Barr body test. Dr. Noguchi stated that in the F or Y body test, developed and accepted in 1967 or 1968, the male Y -chromosome fluoresces after being stained and that 'this Y chromosome -shines like an “ eastern star ”, indicating male origin. Dr. Noguchi testified that -the drumstick test seeks to identify in mature white blood cells, called polymorpho-nucleated leukocytes, a nuclear appendage on the X chromosome of a definite shape within a certain micron -range. This is called' a drumstick and indicates female origin. He stated that such appendages have been identified and accepted scientifically since 1954. Dr. Noguchi stated that the Barr body test, recognized -and accepted scientifically since 1949, seeks to identify the Barr body in tissues other than blood. It is a hollow -chromatin mass of a certain micron range located on the X chromosome near the perimeter of the nucleus, again indicating female origin. This witness testified that all three techniques were utilized in examining leukocytes and epithelial cells removed from the defendant’s coat.
Dr. Noguchi also testified as to the scientific controls he utilized. Positive land negative controls were used in the F or Y body test when examining a total of 446 cells retrieved from the defendant’s coat. The controls were white cotton cloth stained at specific intervals two to three years ago with known male and female blood. He ¡then stated that the blood cells from *1080 these white cotton cloths were .removed and placed on glass ¡slides and thereafter' stained. These known stained slides of male and female white hlood cells were then examined and compared with the 446 -unknown cells, which had been similarly stained and placed on glass slides.
With respect to controls for the drumstick and Barr body tests, Dr. Noguchi testified that the controls used were fresh cells because .any old known samples for purposes of comparison were not ¡available. Furthermore, ¡this witness testified that comparable controls for these latter two tests were not required, and an objective determination could be made without use of comparable controls.
Dr. Noguchi stated that when the 446 cells were ¡stained and studied by fluorescent microscopy, no F or Y bodies were determined to be ¡present in the nuclei of these sexually unknown cells because of lack ;of fluorescence. Terming this technique an exclusionary test for female cells, Dr. Noguchi testified that the frequency per 500 fresh cells, cells that are recently fixed and stained, should be :at -least ¡40%. In the 100 cells used as the known male controls, 10% or 20% F or Y bodies, the fluorescing Y chromosomes, were found. The witness noted that even in fresh known female leukocytes Y body fluorescence can be found in a .very small percentage of cases, due to -the Klinefelter Syndrome. Dr. Noguchi testified ¡that the negative F or Y body results on the 446 unknown white hlood cells “ strongly indicated ” that the cells were of female origin .and it was “ highly probable ” that .the blood was of female origin.
Concerning the ¡drumstick test, which was ¡done with Dr. Alfi, Dr. Noguchi testified that in ¡an examination of the 446 unknown leukocytes retrieved from defendant’s coat, 20 polymorphonueleated cells were capable of analysis. In these 20 cells the Doctor stated he found two, and possibly -a third, definite drumsticks. He further testified that -in known fresh female white blood cells, the incidence of drumsticks ranges from 1:40 to 1:80 cells per 500 known female leukocytes, assuming the female to be in healthy physical condition. The doctor further said that in his previous experimental work these ratios will increase significantly for numerous reasons, e.g., a fever or infection. Then the number ¡of multilobulated mature leukocytes diminishes because the role of the mature white blood cell in the cited examples is to destroy the 'bacteria or virus causing the fever or infection. Dr. Noguchi stated that where the female is in such ¡a condition, the ratio of drumsticks in 500 leukocyte cells will be 1:100. This witness testified that whereas he found *1081 two definite drumsticks, 6 to 11 would be observable in .a normally healthy female’s blood. It was Dr. Noguchi’s opinion that the analysis for drumsticks of ¡the 20 cells from the 446 unknown cells indicated female origin.
With respect to the Barr body test, which was done with Dr. Alfi, Dr. Noguchi stated that out of 28 unknown epithelial squamous cells taken from the defendant’s coat he found one or two definite Barr bodies. The control used was 500 fresh squamous epithelial cells .taken from the lining of the mouth. In this fresh known female control, 50 to 80 Barr bodies were found. Dr. Noguchi testified that in this opinion the unknown cells were of female origin and were squamous epithelial cells from the mouth of a female.
As to scientific acceptance of the doctor’s tests, the witness stated that no independent, validation had been done theretofore by other scientists with dried blood of this age. He further admitted that no studies have been initiated to determine the interaction, if any, between the chemicals in the coat fiber and the chromosomes in the cell nuclei to .ascertain the extent of preservation or autolysis of the chromatin material inside the cell nucleus. Dr. Noguchi stated that a Dr. Ishizu, currently working with the witness in the Los Angeles County Medical Examiner’s office, is the only specialist in this field who has written a scientific paper on this subject. In his research, cell retrieval was performed by Dr. Ishizu on dried blood stains no older than 10 months. Dr. Noguchi testified that he had never studied 22-month-old or older dried blood prior to this case.
Dr. Noguchi concluded that in the F or Y body test, the drumstick test, and the Barr body test, the findings are .subjective but the 'criteria for sex determination is accepted in the .scientific community. He stated that the 11 scientific breakthrough ’ ’ is in the analysis of dried blood stains, ias opposed to blood freshly drawn, placed on a slide and stained, and in the retrieval of the cells from dried blood stains over one year old.
The next witness was Dr. Omar S. Alfi, an expert in cytogenetics and in ,the identification of cells from examination of sex chromatin material. He testified that the F or Y body test was recognized in 1970 in .studies done by Casperson for the presence of the male Y chromosome. This witness stated that the Y chromosome is found in all cells of the male, including blood cells and epithelial cells. Dr. Alfi also testified .that the drumstick or Barr body is the second X chromosome .and that it is inactive. Dr. Alfi .stated that drumsticks or Barr bodies are not found in 'the leukocytes in known normal male blood. *1082 He further stated .that the true drumstick or Barr body is found only in females. An exception is the Klinefelter Syndrome (XXY), ¡affecting one male in every 600. Dr. Alfi testified that for the ¡F or Y body test he examined 15 epithelial cells removed from defendant’s jacket. It was Dr. Alfi’s opinion that the epithelial cells he examined were of female origin. He 'stated that in .a fresh buccal smear containing squamous epithelial cells he would expect, to find in 15 cells 60% F or Y ¡bodies fluorescing. He stated that the absence of F or Y bodies indicate: (1) female cells; or (2) male cells with very short nonfluorescent Y chromosomes; or (3) ,an F or Y body that has lost its fluorescence. Dr. Alfi stated that he eliminated the third possibility because control slides of known male cells three years old did fluoresce reflecting the presence of F or Y bodies. He ¡stated further that the second possibility was eliminated on the basis that less than 1 % of males have a very short nonfluorescent Y chromosome.
Dr. Alfi testified that with respect to the drumstick test for the presence of female cells he .examined 37 cells and carefully studied 20. He said that he found one definite 'drumstick, but that he could not express an opinion as to the sex of those 20 cells because in a sample of 20 mature white blood cells, i.e., well-defined polymorpho-nucleated cells, the incidence of drumsticks would be 0 to 3 drumsticks. Finding one drumstick, was insufficient for him to state 'an opinion.
With respect to tihe QBarr body test, Dr. Alfi testified that he examined 28 Avell-defined epithelial cells out of a total of 53 epithelial cells. He ¡stated that he found three definite Barr bodies, two others highly suggestive and possibly a third. Dr. Alfi stated that it was his opinion that the results are inconsistent Avith the cells being- of male origin. He stated that he believed the cells were female with possibly unhealthy X chromosomes. Accounting for the low incidence of Bar,r bodies in the subject cells, ¡the witness stated further that in order to conclude that the cells were from a healthy female he would have to find Barr bodies in 20% of the 28 cells examined. He said he was: .able to determine the sex from the 28 cells he studied but was unable to conclude whether the female cells were from a healthy female. This witness also stated that the type of fabric from which the cells were extracted could affect the morphology of the cells. In addition, the chemical composition of the fabric itself could affect — either ¡by inhibition or promotion — the enzymes’ capability to destroy the cell’s components. This witness stated that while he knew of no sex determination *1083 tests performed on dried1 blood cells 22 months old and had read no scientific literature on blood stains this old, the techniques for examination of sex chromatin material in the nucleus to determine the sexual origin of cells were well established. The only problem in his opinion was the recovery of the unknown cells from aged dried unstained blood for study and analysis.
It must be noted that Doctors Noguchi .and Alfi did not work independently on the drumstick or Barr body tests. Indeed they worked together. Therefore their testimony is quite similar and may be cumulative.
Dr. Donald K. Briggs, an expert in the isex determination of leukocytes and epithelial cells, was called by the defendant. He testified that valid controls are essential in sex chromatin studies of aged blood “because when we put this matter [sex determination] to objective control * * * it does not stand up to adequate scrutiny.”
This witness further testified' that he attempted to study and diagnose aged dried blood cells removed from cloth and other objects without success. He stated that blood cells become distorted: (1) due to blood clotting; and (2) due to the process of retrieval from the object. Doctor Briggs testified that because of these two factors dried blood cells cannot be studied for the presence of drumsticks or Barr bodies.
This witness further stated that although he had no experience with the F or Y body test he did have experience with the drumstick test and Barr body test. Doctor Briggs stated that he could not express any opinion as to sex origin on the finding of one drumstick in ian examination of 20 leukocytes. He said that a minimum of 500 cells would be required for examination and analysis, with a finding of at least six drumsticks, and where there was an important decision dependent he would require the tests to be repeated with additional cells provided.
Concerning the Barr body test, Doctor Briggs testified jfchat he could not state any opinion on the basis of 28 epithelial squamous cells examined. He stated' that a minimum of a few hundred cells would be required with a finding of at least 20% Barr bodies. He also testified that with ‘ ‘ certain obscure exceptions ” microscopic examinations of epithelial cells do not even confer identity as to their species.
The next witness called by the defendant was Dr. Body Cox, an expert in the isex determination of cells from examination of nuclear chromatin material. He testified as to the necessity fo,r extensive controls in sex determination of aged blood, both *1084 as to drumstick -and Barr body tests, and to the difficulty of the drumstick test unless time-consuming preparations were made. He further stated that finding one definite drumstick' and possibly :a second or third would not be a sufficient number for him to express an opinion as to the sexual origin of those cells. Doctor !Oox testified that on the basis of these findings in examination of 20 unknown polymorp'ho-nucleated cells, he could not exclude the male. This for the reason that both the objective findings and the number of cells examined were far too limited. He stated that in his examination of the 'Slides and photographs of the blood found on defendant’s jacket the cell nuclei were distorted, that the cells contained much debris and that the morphology of the cells had been ,so altered that any analysis was hazardous. He said that he requires in the unknown sample 500 cells in which 20 to 30 drum-sticks should be observed.
'Concerning the Barr body test, Doctor Cox testified that known female cells will contain Barr bodies in 20% to 50% -of the cell nuclei. The doctor testified that in ‘the sample of 28 epithelial cells examined, the presence of two definite Barr bodies and two or three highly suggestive Barr bodies, i.e., a 17% rate of identification at best was not a sufficient number of cells upon which to base an opinion. Similarly, the number of cells analyzed were too few. He did state, however, that 12% of 1,000 cells would warrant a reliable conclusion.
This witness stated further that conclusions from 22-month-old blood subjected to any test are unreliable because cell proteins might 'Change due to enzyme activity in the cell itself. He added further that distortion can -occur solely by reason of .retrieval of the cells from cloth -or other subject.
The last witness -called by the defense was Doctor Alexander S. Wiener, an expert in hematology .and in the examination of blood stains -and blood smears. He testified that sex identification of freshly stained white blood cells is in itself difficult. He testified further that except in fresh blood, the examination of dried blood is unrewarding because the cells are extremely damaged and therefore unrecognizable. This witness stated that he had not heretofore investigated sex analysis from dried blood, but that in connection with this case he attempted, with Doctor iCox, to examine isex chromatin material in cell nuclei from the subject dried blood stains. Doctor Wiener testified that he wias unable to recognize the cell Components in the cells he examined.
*1085 In determining whether these scientific tests and results are admissible, this court must consider whether the .scientific principle is recognized, -and *1 while -courts will go -a long way in admitting expert testimony deduced from a well-recognized -scientific principle or -discovery, the thing from which the deduction i-s made must be sufficiently established to have gained general -acceptance in the particular field to which it belongs. ’ ’ (Frye v. United States, 293 F. 1013, 1014; People v. Carter, 48 Cal. 2d 737; People v. Williams, 164 Cal. App. 2d 858; see, also, United States v. Sidling, 350 F. Supp. 90; State v. Coolidge, 109 N. H. 403, revd. on other grounds sub nom. Coolidge v. New Hampshire, 403 U. S. 443, reh. den. 404 U. S. 874; cf. Coppolino v. State, 223 So. 2d 68 [Fla.], app. dsmd. 234 So. 2d 120, cert. den. sub nom. 399 U. S. 927; McCormick, Evidence [2d ed.], § 203; Ann. 49 ALR 3d, Admissibility of Spectrographic Evidence, p. 915.) Moreover, the general scientific acceptance test is difficult to apply in -specific instances (McCormick, Evidence [2d .ed.], p. 491, n. 34).
This court view-s the issue herein to be the competency -and reliability of evidence as to the retrieval and -analysis of leukocytes -and epithelial cells from .22-month-old dried blood stains and its acceptance within the -scientific community.
Discussing the scientific acceptance first, it is a well-recognized medical fact that the nuclei of human white -blood cells -and epithelial cells when freshly -drawn, placed on glass .slides and stained, can be and have been examined countless times, particularly for the diagnosis of sexual -disorders in infants. For - this purpose these tests are accepted within the medical and scientific community. Because these tests have gained scientific acceptance for analysis of freshly drawn blood cells or cell tissue to determine the sexual -origin thereof, it does -not follow that this scientific acceptance embraces the analysis for sexual origin of white blood and epithelial cells retrieved from old dried blood stains.
At the outset, the scientific research performed to -date by Doctor -hiog-uchi working in conjunction with Doctor Ishizu in California has been done on dried blood stains 10 months old or less. Only one article in -this area has been published for the edification -of colleagues. In this connection, none -of these test results have been duplicated by -scientists to confirm these results. Furthermore, no court in any jurisdiction in the United States has been presented with or accepted the admissibility -of these tests.
*1086 The .absence- of scientific literature in this specialized field, while not determinative of the issue, must be considered on the question .of general scientific acceptance. While this court is cognizant that nuclear sex determination is a highly specialized area with a limited number of specialists therein, the absence of verification of the published data is relevant on the issue of scientific .acceptance.
As to competency .and reliability of this evidence, this court is faced with the troublesome question of the absence of valid control. The only control that is arguably valid is the exemplar for the F or Y body test. No .similar controls were established for the drumstick or ¡Barr body test. Dotcor Noguchi 'himself stated that without controls tests -could be invalid. Moreover, no studies have been done concerning the potential interaction between chemical fibers of synthetic cloth and sex chromatin matter in cell nuclei. Where the proof adduced on both sides reveals that the opinion of an expert must depend in large measure -on the number of F or Y bodies, drumsticks, or Barr bodies observed in a given unknown number of cells, this court must give great weight in deciding the issue presented to the lack of any such studies or controls, where the latter would be indicated. Additionally, it is significant that no sample of the defendant’s blood was submitted for analysis to determine the presence or absence of the Klinefelter Syndrome, notwithstanding the People’s ability to secure defendant’s blood for this analysis (Schmerber v. California, 384 U. S. 757).
This court is aware, moreover, that the drumstick -test results as testified to by Doctor Noguchi were discounted .by Doctor Alfi. Further, when the test results of the People’s expert witnesses are contrasted with the opinions expressed by the defendant’s expert witnesses concerning the validity of the data upon which the People rely, it .becomes evident that opinions based on subjective determination of presence of F or Y body, the analysis of 20 polymorpho-nucleated leukocytes for the drumstick test and 28 epithelial cells for the Barr body test is not sufficient so as to convince this court that the test results are reliable.
Doctors Briggs and Cox have denied the reliability of the tests because, first, -that 22-month-old unprepared blood smears cannot be examined for ,sex chromosomes; second, that the test subject findings .thereon are far too limited and too infrequent. Although the objection that the tests and findings are inconclusive, is -one that goes to the weight of .evidence (United States v. Stifel, 433 F. 2d 431, cert. den. 401 U. S. 994; McKay v. State. *1087 155 Tex. Or. Rep. 416), an ultimate question of fact for the jury, it still must be considered by the preliminary trier of the facts in determining the competency of the testimony in assaying whether this testimony reaches the minimal level of competency as admissible evidence.
"Where, as was here testified, the determination as to sexual origin of cells must exclude micron size masses called pseudo drumsticks and pseudo Barr bodies for a reliable analysis, the limited number of unknown cells so examined, contrasted with the defense experts’ testimony as to the number of cells that would be required for .analysis, convinces .this court that the number of cells examined is insufficient as a matter of law for a determination as to the .sexual origin of these cells. Given the defendant’s1 expert testimony that cell morphology undergoes distortion upon retrieval and given the potential for cell destruction due to enzyme activity and the clotting process, this court does not believe that the People have met their burden of proving the competency of this testimony.
The Court of Appeals in People v. Leone (25 N Y 2d 511), faced with the question of the admissibility of the lie-detector test, set forth the standard to ¡be applied in determining the admissibility of polygraph evidence. The rule there expressed is here pertinent. “Although perfection in test .results is not a prerequisite to the admissibility of evidence obtainable by the use of scientific instruments, the rule has been to grant judicial recognition only after the instrument has been sufficiently established to have gained general acceptance in the particular field to which it belongs. (Wigmore, Evidence [3d ed.], § 990.) ” (id., p. 517.)
Applying this standard to this case, this court concludes that the test results are not admissible. In reaching this determination this court is fully mindful of the danger inherent in the receipt of .such testimony in the eyes of a jury. (McCormick, Evidence [2d ed.], p. 439, n. 30.) For that reason “we should be most careful in admitting into evidence the results of such tests unless their reasonable accuracy and general -scientific acceptance are clearly recognized.” (People v. Leone, supra, p. 518.)
This court cannot stress too much its fear of undue prejudice to defendant in the receipt of this questionably accepted scientific testimony. The People’s case in chief is bottomed solely upon circumstantial evidence. The admission of this testimony, with a seeming .scientific imprimatur, pointing to female blood on defendant’s jacket in contradiction to defendant’s claim that the *1088 blood was ¡his blood, would in the court’s view be ¡highly prejudicial to defendant, far outweighing its probative value.
Accordingly, 'the defendant’s motion to preclude testimony concerning tests performed on cells in dried blood stains retrieved from the defendant’s coat is granted.