■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LEONARD GOLDFADEN, Appellant.—Judgment rendered February 14, 1975, in Supreme Court, Bronx County, convicting the defendant, upon a jury verdict, of manslaughter and robbery and imposing a prison sentence unanimously reversed, on the law, and the case remanded for a new trial. Defendant's mother was murdered in her apartment in the Bronx during the early hours of December 19, 1972. Death had been caused by strangulation and a fractured skull. Defendant was accused of his mother's murder and of stealing an undetermined amount of money from her. The People's case rests solely on circumstantial evidence. Shortly after the discovery of the murder, several detectives, accompanied by defendant's brother Edward, went to the defendant's apartment. Goldfaden then accompanied the police officers and his brother to the precinct. He was wearing a leather jacket on which one of the detectives perceived blood stains. When asked how the blood got there, Goldfaden answered: "I was in a fight." However, when questioned about his opponent's identity, defendant demanded to see a lawyer. Crucial to the People's case was proof that the stains on defendant's jacket had actually been made by the blood of the victim, and in his attempt to prove that they were from female blood, the District Attorney called Dr. Thomas Noguchi, Chief Medical Examiner of Los Angeles, California, and qualified him as an expert in the sex identification of blood. It appears that it is scientifically accepted that certain properties in *fresh* blood cells enable doctors to determine whether the blood came from a man or a woman. For this purpose, Dr. Noguchi has used the "Fluorescent Body Test" developed in 1967. With this test, one is allegedly able to detect male (Y) chromosones which, when stained, show up under fluorescence. Since female (X) chromosones do not show up under fluorescence, one may then determine by this test whether the blood is from a man or a woman. It was this test that Dr. Noguchi performed upon Goldfaden's jacket in early November, 1974, about two years after the murder. Defense counsel's request for a hearing to determine the reliability of Dr. Noguchi's fluorescent body test was denied. His vigorous objections to Dr. Noguchi's testimony were overruled and the doctor was permitted to testify that using a fluorescent microscope, he examined the blood samples to ascertain whether any male or Y chromosones were present. He explained that under this special microscope, a male

chromosone would pick up the fluorescent light. Finding none, he concluded that "based on medical reasonable certainty, this indicates that the blood found on that leather jacket came from a female person. That is, most likely, highly probable, I prefer to use." This same issue was presented in *People v Alston* (79 Misc 2d 1077), a murder case remarkably similar to this one. There, Mr. Justice Kapelman conducted extensive hearings to determine whether Dr. Noguchi's tests (the identical tests testified to herein by the same doctor) were competent as scientific procedures which had gained general acceptance among doctors and scientists in this field. The pivotal factor in *Alston* was that the tests had been conducted upon aged (22-month-old) blood stains, dried blood and not on fresh blood. Dr. Noguchi testified in *Alston* that he had never before performed these tests on 22-month-old dried blood. Thus the instant case represents Dr. Noguchi's second venture into this area. It is evident, therefore, that we are not dealing with a test which has gained acceptance in the medical and scientific world. Indeed, defendant's counsel calls our attention to the testimony of Dr. Ishizu, the author of the only known scientific paper on the subject, who in *Alston* stated that blood more than 10 months old could not be tested with reliable results. (To like effect, see Ishizu, Studies on Sex Identification of Human Blood and Blood Stains, Japanese Journal of Legal Medicine [vol 27, No. 3, May, 1973], pp 173, 177.) *People v Leone* (25 NY2d 511) teaches that tests such as the one performed by Dr. Noguchi should be granted judicial recognition only after they have been sufficiently established to have gained general acceptance in the particular field to which they belong. The Court said (p 518): "We are all aware of the tremendous weight which such tests would necessarily have in the minds of a jury. Thus, we should be most careful in admitting into evidence the results of such tests unless their reasonable accuracy and general scientific acceptance are clearly recognized." (See, also, 3A Wigmore, Evidence [3d ed], § 990.) We find no justification for limiting the qualification of the sole defense witness, Dr. Briggs, as an expert only in hematology in scientific tests conducted with fresh blood. We perceive no basic difference in Dr. Briggs' and Dr. Noguchi's qualifications in identifying blood as being from a man or a woman. We are unable, on this record, to rule on the admissibility of the leather jacket taken from the defendant and of the exculpatory statements made by the defendant to a detective and to an Assistant District Attorney during questioning. We suggest that a full suppression hearing be held before the retrial to enable the trial court to intelligently pass upon these issues. (See *Brown v Illinois*, 422 US 590.) Considering the likely effect upon the jury of Dr. Noguchi's testimony to the effect that the blood found on defendant's jacket was female blood, and the erroneous limitation of Dr. Briggs' testimony, we feel that substantial error was committed depriving the defendant of a fair trial and warranting a reversal and a new trial. Concur—Stevens, P. J., Markewich, Murphy, Silverman and Nunez, JJ.