229 Kan. 47 (1981)
622 P.2d 986
STATE OF KANSAS, Appellee,
v.
ADRIAN C. WASHINGTON, Appellant.
No. 51,885
Supreme Court of Kansas.
Opinion filed January 17, 1981.
Ronald E. Wurtz, of Topeka, argued the cause, and Robert E. Keeshan, of Topeka, was with him on the brief for the appellant.
Sally Davis Pokorny, assistant district attorney, argued the cause, and Robert T. Stephan, attorney general, and Gene M. Olander, district attorney, were with her on the brief for the appellee.
The opinion of the court was delivered by
PRAGER, J.:
This is a direct appeal from convictions of first-degree murder (K.S.A. 21-3401), rape (K.S.A. 1979 Supp. 21-3502), and aggravated burglary (K.S.A. 21-3716). The charges and convictions stem from the stabbing death of Cathy Cummings in her apartment at 1325 Tyler, Topeka, on June 17, 1979.
The circumstances of the homicide were essentially undisputed. The time of death was established as being between 1:00 and 3:00 a.m., although the body was not discovered until 9:15 a.m. by friends. Police arrived on the scene shortly thereafter. The *48 victim was naked from the waist down and was lying in a large pool of blood resulting from multiple stab wounds. Blood was also found splattered on a wall. Smaller drops of blood were found leading from the room where the body was found to the back door, which was ajar. The rear window was open and the screen was missing. The autopsy revealed eighteen stab wounds from two different instruments. One wound severed the carotid artery, accounting for the blood on the wall. The coroner testified that it was unlikely that the assailant could escape without getting some of the victim's blood on him. A vaginal swab revealed the presence of spermatozoa, indicating the victim had had sexual intercourse within the past twenty-four hours. There was no trauma to the vaginal area.
Earlier that morning, around 6:00 a.m., a Topeka police officer talked with defendant, Adrian Washington, at St. Francis Hospital. Defendant was being treated for a stab wound. Defendant told the officer he had been walking in the alley toward his father's house at 1631 Tyler, when he was attacked and stabbed in the shoulder by two men, one white and one black. Defendant was vague about the description of his assailants. Defendant said he was able to flee to a friend's house on Western Street, and that friend brought him to the hospital emergency room. Defendant was arrested on an outstanding bench warrant for a traffic offense and taken to the police station where he was questioned about an attempted car theft in the same area where he said he was assaulted. He was given the Miranda warnings and asked to sign a consent form for his fingerprints. After his fingerprints were taken and the amount owing on the bench warrant paid, defendant was released.
Subsequent investigation revealed evidence tending to tie defendant to Cathy Cummings's murder. Defendant's fingerprints were discovered on the outside of the rear screen door of the victim's apartment and on a window screen found in bushes two doors down from the Cummings residence and next door to defendant's house. Two foreign pubic hairs were found on the victim. Comparison of those with pubic hairs taken from the defendant established twenty-one similar microscopic characteristics, with no dissimilarities. However, the expert witness was unable to state that the foreign pubic hairs found on the victim "came from Adrian Washington beyond any scientific doubt." *49 Blood samples taken from defendant were compared with drops of blood found in the apartment leading to the back door. They were found to be remarkably similar.
Defendant's first point on appeal is that the trial court erred in admitting expert testimony concerning the blood tests. At trial, the State called Eileen Burnau, criminalist for the Kansas Bureau of Investigation. Burnau had been with the KBI since 1973, and had specialized in blood analysis for the past five years. She testified that she analyzed the blood samples found in the Cummings apartment and compared them with known blood samples from the victim and defendant. In comparing the blood samples, the blood was broken down into eight different variables. The first was the A-B-O typing, consisting of types A, B, AB, and O. The next six are polymorphic enzyme systems. The first of the six, the EAP enzyme, consists of five types, types A, B, BA, CA, and CB. The next, AK, consists of three types, types 1,2-1, and 2. The ADA, PGM, EsD, and GLO-1 systems also contain three types each, types 1, 2-1, and 2. The final system, Gc, is protein rather than enzyme, also consisting of types 1, 2-1, and 2. Comparison of the defendant's and the victim's blood was as follows:

 ABO EAP AK ADA PGM EsD GLO-1 Gc
 Cummings A BA 1 1 1 1 2-1 2-1
 Washington A B 1 1 1 1 2 1.

Burnau testified to the percentage of the Caucasian population having each of the types present in Cummings's blood. She also testified to the percentage of the Negroid population which would have each of the types present in defendant's blood. Multiplying the highest of each percentage together, she determined that 3.1% of the Negroid population would have the same combination of enzymes and proteins as the defendant. Burnau testified that the seminal fluid obtained from the vaginal swab did not show the blood type, indicating that the person who had had intercourse with the victim was a nonsecretor. Saliva samples were tested for both the victim and the defendant, and both were determined to be nonsecretors. Studies show that only 20% of the population are nonsecretors. Adding this factor to her other percentage, Ms. Burnau determined that only 6/10ths of 1% of the population would have defendant's combination of blood factors.
Burnau stated that she collected blood samples from several areas in the apartment and compared them with the known blood *50 samples of defendant and the victim. In six different areas, including the kitchen and back door, she found blood characteristics consistent with the defendant's blood. On all the blood samples, she used a method of analysis called the Multi-System method of analysis or Multi-System analysis. She testified that this method was used throughout the forensic community because of its speed, consistency, and reliability, and that its distinguishing feature is that it allows the analysis of three enzyme systems from one sample at one time. Defendant objected to the use of the Multi-System analysis, contending that it is unreliable and that Burnau was not qualified either to perform the analysis or to testify as to her results. In support of its unreliability argument, the defense offered the testimony of Dr. Benjamin W. Grunbaum. Dr. Grunbaum possesses an impressive string of credentials, including bachelor's, masters, and doctoral degrees in biochemistry, and a masters in criminology with a specialty in criminalistic identification. Dr. Grunbaum has been employed as a research biochemist at Berkeley for the past 27 years, specializing in analytical biochemistry and microanalysis, which includes the examination of body fluids.
Dr. Grunbaum testified that he did not approve of the use of the Multi-System analysis because of its unreliability. He further testified that, after examining photographs of the tests performed by Burnau, he disagreed with several of her test results. Specifically, Dr. Grunbaum complained that blood, once outside the body, is always deteriorating. He explained that the degradation was particularly acute in the EAP and GLO enzymes. Because of the length of time and the fact that the blood samples were dry, Dr. Grunbaum testified that the test of the samples in this case could not be reliable. As to the EAP enzymes, he stated his belief that the A factor begins to deteriorate most rapidly, so that after a period of time, an AB type might show up as a B. Because the differences in the blood types of the victim and the defendant were the EAP (the victim was a AB and the defendant a B), GLO-1, and Gc enzyme systems, Grunbaum testified that the possible interceding degradation rendered the testing unreliable and the victim's blood stains indistinguishable from the accused's. He further testified that some of Burnau's tests were inconclusive, and should have been repeated "over and over again to show beyond any shadow of a doubt that it is really individualizing the defendant."
*51 Dr. Grunbaum also stated his opinion that the Multi-System of enzyme analysis used in this case is inherently unreliable. He testified that the University of California at Berkeley contracted with Aerospace Company and Beckman Industries for the development of the Multi-System analysis. He encouraged Aerospace and Beckman to hire a technician, Brian Wraxall, to help with the project. He testified that after ten months of work on the project, they had not had one successful test, and at Grunbaum's urging, the university withdrew from the project. The project was completed under the direction of Brian Wraxall, and Dr. Grunbaum challenged the final results, claiming falsification of the final report. Two letters from the Department of Justice, Law Enforcement Assistance Administration, were admitted into evidence. One tended to impeach Dr. Grunbaum's credibility, stating that the LEAA had found no evidence to support Grunbaum's allegations. The second letter was introduced to rehabilitate the witness and stated that any "manipulation of results" remained unconfirmed and certainly did not exist at the managerial level, but that the LEAA, on the basis of the allegations, had decided not to publish the results. Dr. Grunbaum also testified that, apart from use in crime laboratories, the Multi-System analysis was not accepted within the scientific community.
In rebuttal, the State offered the testimony of Mark Stolorow, who has a bachelor's degree in chemistry and a masters in forensic chemistry. At the time of the trial, he was working for the State of Illinois Department of Law Enforcement, Bureau of Scientific Services, specializing in forensic serology. Stolorow had been invited to participate in the Aerospace/Beckman research project and had worked with Grunbaum and Wraxall for eight months before leaving the project. He testified that the research group had split to research two different tracks, with Grunbaum and his assistants testing enzyme analysis with a cellulose acetate base, which Grunbaum preferred. Wraxall and Stolorow performed enzyme analysis with a starch gel base, which is currently used in the Multi-System analysis as developed by Wraxall and Stolorow. Stolorow testified that the entire research group did EAP readings on both cellulose acetate and starch gel mediums for an official report, but that Grunbaum's readings were so inaccurate and erratic that they were deleted *52 from the report. Stolorow's testimony also contradicted Grunbaum's on the degradation of the EAP enzyme after leaving the body. Stolorow stated that the enzyme was less likely to deteriorate when dried than if kept in liquid form. He testified to the reliability of EAP enzyme analysis on dry blood stains, and that the reliability was well established. (This corresponds to the State's introduction of a booklet called "The Detectability of Selected Genetic Markers & Dry Blood Upon Aging" published by the National Institute of Law Enforcement & Criminal Justice, in the cross-examination of Dr. Grunbaum. This publication concluded that EAP enzymes did not deteriorate for a period of up to thirteen weeks).
Stolorow also testified that the Multi-System analysis "affords discrimination which is reliable; discrimination which ... can achieve a greater degree of discrimination than preceding comparable methodology; and with someone who has been adequately trained, and most important, adequately certified, ... these systems are very reliable and are a valuable tool to criminal laboratories across the country." Stolorow testified that, within his personal knowledge, over 100 crime laboratories throughout the United States and Canada are now using the Multi-System analysis. He further stated that while he knew the FBI was interested in the Multi-System analysis, had approved it, and was now teaching it in the FBI academy, he did not know if they were presently using it in their own crime laboratory. Burnau had earlier testified that she had talked with Jim Kearney of the FBI Research Laboratory the preceding week, and that the FBI was pleased with the Multi-System analysis and was using it routinely. Stolorow also viewed, with some reluctance, the same photographs of Burnau's EAP tests with which Dr. Grunbaum had disagreed. Stating that analysis of photographs could not give a definitive typing of the enzyme, he nonetheless did not see any typing that he would change.
The trial court allowed all of the conflicting testimony on the specific blood analysis and the reliability of the Multi-System analysis method to be introduced into evidence. The jury was instructed to weigh the evidence concerning the general acceptance of the Multi-System analysis and, if the jury found the test not to be generally accepted, they were not to use the test results in their deliberations.
*53 In determining the admissibility of the expert testimony pertaining to Multi-System analysis in this case, it would be helpful to consider certain general principles of law pertaining to the admissibility of expert opinions concerning particular scientific techniques. The briefs of counsel and our own research disclose no reported cases where expert opinion pertaining to Multi-System polymorphic enzyme analysis has either been approved or rejected for consideration by a jury in a criminal case. We are thus faced with a case of first impression. The general test for determining the admissibility of a new scientific technique was enunciated in Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923). Simply stated, Frye requires that, before a scientific opinion may be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. Thus, according to the Frye standard, if a new scientific technique's validity has not been generally accepted or is only regarded as an experimental technique, then expert testimony based upon its results should not be admitted into evidence. Reed v. State, 283 Md. 374, 391 A.2d 364 (1978).
Frye v. United States, 54 App. D.C. 46, was cited with approval in State v. Lowry, 163 Kan. 622, 629, 185 P.2d 147 (1947). Frye and Lowry both involved the admissibility of the results of a lie detector examination. The Frye test has been accepted as the standard in practically all of the courts of this country which have considered the question of the admissibility of new scientific evidence. The Frye test has been utilized by courts in their consideration of the admissibility of paraffin tests (Brooke v. People, 139 Colo. 388, 339 P.2d 993 [1959]); medical testimony regarding the cause of birth defects (Puhl v. Milwaukee Automobile Ins. Co., 8 Wis.2d 343, 99 N.W.2d 163 [1959]); breath analysis devices designed to test for intoxication (People v. Morse, 325 Mich. 270, 38 N.W.2d 322 [1949]); truth serum injections (State v. Linn, 93 Idaho 430, 462 P.2d 729 [1969]); blood tests (People v. Alston, 79 Misc.2d 1077, 362 N.Y.S.2d 356 [1974]); neutron activation analysis (State v. Stout, 478 S.W. 368 [Mo. 1972]); Nalline tests for detection of narcotics use (People v. Williams, 164 Cal. App.2d Supp. 858, 331 P.2d 251 [1958]); ink identification tests (United States v. Bruno, 333 F. Supp. 570 [E.D. Pa. 1971]); and hypnotism (People v. Busch, 56 Cal.2d 868, *54 16 Cal. Rptr. 898, 366 P.2d 314 [1961]). The Kansas cases have consistently rejected the results of lie detector tests when offered in evidence for the purpose of establishing the guilt or innocence of one involved in crime. State v. McCarty, 224 Kan. 179, 578 P.2d 274 (1978); State v. Stafford, 213 Kan. 152, 162, 515 P.2d 769 (1973); State v. Hemminger, 210 Kan. 587, 595, 502 P.2d 791 (1972); and State v. Lowry, 163 Kan. 622.
In oral argument in this case, counsel for the State suggested that the Frye test should be abolished, implying that expert opinion on scientific tests should be admissible in every case, if one of the parties found an expert who said the test was reliable. We believe that such a rule would produce utter chaos and resulting injustice in criminal cases. In People v. Kelly, 17 Cal.3d 24, 31-32, 130 Cal. Rptr. 144, 549 P.2d 1240 (1976), the California Supreme Court points out the desirability of the Frye test in the following language:
"Frye was deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence based upon new scientific principles.... Several reasons founded in logic and common sense support a posture of judicial caution in this area. Lay jurors tend to give considerable weight to `scientific' evidence when presented by `experts' with impressive credentials. We have acknowledged the existence of a `... misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.'"
As pointed out by counsel for the defendant in his brief on appeal, a jury of laymen should not, on a case-by-case basis, resolve a dispute in the scientific community involving the validity of a new scientific technique. Courts should be reluctant to resolve the disputes of science. It is not for the law to experiment, but for science to do so. Without the Frye test, juries would be compelled to make determinations regarding the validity of experimental or novel scientific techniques. As a result, one jury might decide that a particular scientific process is reliable, while another jury might find that the identical process is not. Such inconsistency concerning the admissibility of a given scientific technique or process in criminal cases would be intolerable.
In objecting to the State's expert testimony pertaining to the Multi-System analysis, it is important to note that the defense did not attack the admissibility of blood tests or polymorphic enzyme analysis in general. In taking this position, defendant correctly recognized that, throughout the United States today, the courts *55 generally hold admissible in criminal prosecutions blood grouping tests as relevant evidence tending to prove the identity of the accused as the criminal, to establish the accused's presence at the scene of the crime, or to corroborate other evidence that a crime in fact has occurred. For an excellent, recent annotation on the subject of the Admissibility, Weight, and Sufficiency of Blood Grouping Tests in Criminal Cases, see 2 A.L.R. 4th 500, where many cases on the subject of blood grouping tests are cited and discussed in depth. This general rule of admissibility has been recognized in this state in State v. Bircher, 2 Kan. App.2d 15, 17, 573 P.2d 1128, rev. denied 225 Kan. 846 (1978), where the Court of Appeals held the testimony of an expert to be relevant and admissible on the issue of whether the blood on the defendant's clothing was his own blood or that of the victim of an aggravated battery.
Our problem in this case is to determine whether the Multi-System polymorphic enzyme analysis method is sufficiently accepted as reliable by the scientific community to meet the test of admissibility established by Frye. We have concluded from the record that there was sufficient evidence of reliability and acceptance by the scientific community to justify admission of the expert testimony in this case. We have set forth above in some detail the testimony of the State's experts, Eileen Burnau and Mark Stolorow, and the conflicting testimony of the defense expert, Dr. Benjamin W. Grunbaum. We are impressed by the testimony that the Multi-System analysis is reliable and generally accepted in the scientific field as illustrated by its present use in over 100 criminal laboratories in this country and that the FBI research laboratory uses the Multi-System analysis routinely and approves it. It should be noted that the basis for Dr. Grunbaum's opinion that the Multi-System analysis was unreliable was two-fold (1) that his testing had not produced one accurate result, and (2) that the EAP enzyme is subject to rapid deterioration, thus making blood groupings based on EAP analysis unreliable. This testimony was countered by testimony that, in testing, Dr. Grunbaum used a different medium than is used in the method developed by Wraxall. As to EAP enzyme deterioration, the State produced two separate pieces of evidence showing the contrary  that EAP did not rapidly deteriorate, once dried.
The defendant further suggests that there is a difference between *56 the field of forensic science and the field of biochemistry, which renders a forensic expert incompetent to testify on the reliability of blood analysis tests, in contradiction of the testimony of a biochemist. The area of forensic science is obviously made up of many different types of experts, as evidenced by Stolorow's qualifications in chemistry and forensic chemistry. Stolorow, as a forensic chemist, and Dr. Grunbaum, as a biochemist, both specialize in microanalysis and serology. Defendant's position that the only acceptance of the Multi-System analysis is among law enforcement officers untrained in the chemical analysis of blood and other body fluids, is not supported by the testimony, and we find this argument to be without merit.
In the case before us the testimony of various experts supporting and attacking the reliability of the Multi-System analysis was properly placed before the jury for their determination as to the weight such evidence should receive. We hold that the trial court, in applying the Frye test, did not err in ruling that the Multi-System analysis is generally accepted as reliable in the scientific community and that expert testimony on that subject was admissible.
Defendant next challenges the qualifications of Eileen Burnau to testify as an expert as to the reliability of the Multi-System analysis. The admissibility of expert testimony is governed by K.S.A. 60-456(b), which provides:
"(b) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."
Admissibility of expert testimony under this provision lies within the broad discretion of the trial court, and the court's decision will not be reversed on appeal, absent a showing of abuse of that discretion. Lindquist v. Ayerst Laboratories, Inc., 227 Kan. 308, 316, 607 P.2d 1339 (1980); State v. Reed, 226 Kan. 519, 521, 601 P.2d 1125 (1979). In State v. Peoples, 227 Kan. 127, 130, 605 P.2d 135 (1980), this court cited with approval the requisites for admission of expert testimony discussed in Plains Transp. of Kan., Inc. v. King, 224 Kan. 17, 21, 578 P.2d 1095 (1978):
"The purpose of an expert witness is to aid the jury in the interpretation of *57 technical facts or to assist in understanding the material in evidence. (Staudinger v. Sooner Pipe & Supply Corporation, 208 Kan. 100, 105, 490 P.2d 619 [1971].) The witness must have skill or experience in the business or profession to which the subject relates. He must be qualified to impart knowledge within the scope of his special skill and experience that is otherwise unavailable to the jury. (State v. McClain, 216 Kan. 602, 606, 533 P.2d 1277 [1975]; Grohusky v. Atlas Assurance Co., 195 Kan. 626, 630, 408 P.2d 697 [1965].)
"The introduction of opinion or expert testimony is controlled by K.S.A. 60-456. An expert must base his testimony upon facts personally perceived by or known to him or made known to him at the hearing. `Perceived' means knowledge acquired through one's own senses. (K.S.A. 60-459[c].) `Made known' refers to facts put into evidence. [Cites omitted.] The qualifications of an expert witness and the admissibility of his testimony are within the sound discretion of the trial judge. [Cites omitted.] When the trial court admits the testimony it is deemed to have made the findings requisite to its admission. (K.S.A. 60-456[c]; [other cites omitted].) At that point the weight of such testimony is a matter for consideration for the trier of fact."
Eileen Burnau was questioned about her qualifications before rendering the blood analysis testimony. She is currently a criminalist for the Kansas Bureau of Investigation, and at the time of trial had been there 6 1/2 years. For the past five years, she has been involved solely with forensic serology, or the examination and identification of blood and other body fluids. She has a bachelor of science degree, and receive six months on-the-job training when she started with the KBI. Since then, she has attended seminars and training courses. In particular, she attended a two-week course at Georgetown University in 1974, studying generally biochemical examination of blood stains, and specifically, the typing of polymorphic enzymes into distinguishable groups. In 1977, she attended a two-week course in biochemical examination of blood stains and groupings of enzymes and proteins at the FBI Academy. Burnau took a proficiency test relating to her performance in enzyme analysis in 1977, which was sponsored by the Forensic Science Foundation, receiving a perfect score. Burnau testified that she has been using blood enzyme analysis for the KBI since 1975, and has testified in numerous cases on the basis of such testing. Burnau testified that in 1978, she attended a course sponsored by the Serological Research Institute of California. She stated that at this seminar, "everyone there was quite enthusiastic about the new system of developing two or three enzymes on the same plate," or the Multi-System analysis. She further testified to subsequent testing on what was learned in this latter course, and again, her answers were correct on all samples *58 in which she was able to get a positive result. This latter class was taught by Brian Wraxall.
As to reliability, Burnau testified that the Multi-System analysis is based on the same principles as other methods of enzyme analysis, but merely combines the testing. She stated that the Multi-System was chosen for use in the KBI laboratory because of its reliable, consistent, and quick results. She further testified that the Multi-System analysis is now used and accepted throughout the forensic science community, and is currently being used in the FBI crime laboratory. On cross-examination, she acknowledged that only one authority, to her knowledge, disputed the reliability of the Multi-System analysis, that authority being Dr. Grunbaum.
Burnau's education and continuing training in the area of enzyme analysis are sufficient to allow her to be considered an expert in the area and competent to render opinion testimony. As to the specific method of analysis here challenged, Burnau has had the training and subsequent testing stated by Stolorow to be necessary to ensure accurate blood analysis with the Multi-System. As Burnau has used and tested the method in the past, she would be additionally competent to testify on the basis of her own perceptions. The court properly allowed her expert opinion testimony under K.S.A. 60-456(b)(1) and (2).
Defendant next complains that the trial court erred in instructing the jury to determine the reliability of the Multi-System analysis before considering the blood analysis testimony. As noted by the State, there was no contemporaneous objection to the instruction as required by K.S.A. 22-3414(3). Nor was the instruction "clearly erroneous," requiring reversal. No prejudice could have resulted from the instruction. The trial court had already admitted the blood analysis testimony into evidence. Allowing the jury to disregard the blood typing evidence, if they determined it unreliable, gave the defendant an additional opportunity to keep that incriminating evidence out of the jury's deliberations. We find no error in the trial court's instructions.
Defendant next challenges the admission of probability testimony offered by Burnau in the form of population percentages with the same blood characteristics as the accused. Expert testimony of mathematical probabilities that a certain combination of events will occur simultaneously is generally inadmissible when *59 based on estimations rather than on established facts. See Annot., Evidence-Probabilities-Criminal Cases, 36 A.L.R.3d 1194; People v. Collins, 68 Cal.2d 319, 66 Cal. Rptr. 497, 438 P.2d 33 (1968); State v. Sneed, 76 N.M. 349, 414 P.2d 858 (1966). By contrast, population percentages on the possession of certain combinations of blood characteristics, based upon established facts, are admissible as relevant to identification. See State v. Rolls, 389 A.2d 824 (Me. 1978) (EAP enzyme analysis allowed of dried blood found on defendant's pants found to correspond to analysis of rape victim with vaginal laceration); People v. Gillespie, 24 Ill. App.3d 567, 321 N.E.2d 398 (1974); State v. Coolidge, 109 N.H. 403, 260 A.2d 547 (1969) (microanalysis of particles taken from victim's clothing and defendant's automobile). Attacks on the validity of the underlying statistics go to the weight of such evidence, not its admissibility. State v. Rolls, 389 A.2d at 824 (percentage based on FBI and Scotland Yard studies challenged as hearsay; held, the objection goes to the weight, not admissibility); accord, People v. Gillespie, 24 Ill. App.3d at 575. The percentage of population possessing certain blood characteristics has been held to be "reasonably within [the] expertise" of the forensic expert testifying to blood type analysis. Redd v. State, 240 Ga. 753, 243 S.E.2d 16 (1978). In the present case, Burnau testified that her percentage statistics were based on population studies published by the American Association of Blood Banking. Based on these studies, the percentage of blacks in the population having certain characteristics was multiplied by the total number of characteristics found, with a finding that 3.1% would have the same combination of proteins and enzymes. The additional factor that defendant was a nonsecretor reduced the percentage to 6/10 of 1%. Any challenge to the reliability of the testing went to its weight, not its admissibility. The trial court did not err in allowing Burnau to testify to this statistical information.
Defendant next challenges the admission of rebuttal testimony by Joan Hamilton, as assistant district attorney. Hamilton testified in response to the testimony of Dr. Frederick Baker, who stated that of the 100 rape victims he had examined, all bona fide victims had at least some trauma to the sex organs. He stated that the physical injury to the sex organs was fairly severe in homicide cases because of the overall violence of such rapes. He also stated that where the rape is committed, as a result of fear of the victim, *60 there is usually some minor damage to the sex organs, such as small lacerations or scratches, because of spasms caused by fear and lack of lubrication. In his opinion, based on his own experiences, Baker testified that he did not feel Cummings was the victim of a forcible rape. In rebuttal, the State called Joan Hamilton. Hamilton, in her capacity as an assistant district attorney, handles rape cases, and is, additionally, a rape counselor. She has been involved in 250 rape cases. She testified that, from her observations, only 6 of the 160 victims which she personally observed displayed visual evidence of damage or injury.
Defendant challenges this rebuttal testimony, claiming that Hamilton was incompetent to give expert medical testimony. Hamilton testified to her own observations based on prior experience, and could properly be considered an expert under K.S.A. 60-456(b)(1). There was no abuse of the trial court discretion in allowing her to testify as an expert from her own observation. Defendant also challenges the rebuttal testimony as beyond the scope of the testimony of Dr. Baker offered by the State. Although she did not testify to, or purport to testify to knowledge of trauma to the sex organs of the rape victims in cases with which she was familiar, her testimony did, to some extent, counter the evidence presented by defendant, and we cannot say it was not proper rebuttal testimony. Even Dr. Baker did not testify that, where a rape is committed as a result of fear, all victims have damage to the sex organs.
Defendant also claims prejudice to the accused since Hamilton held the position of assistant district attorney. This court has recognized the potential prejudice in allowing a prosecuting attorney to testify in a criminal proceeding. In State v. Ryan, 137 Kan. 733, 22 P.2d 418 (1933), the county attorney testified to statements made to him by the accused which tended to contradict the accused's defense testimony. The Ryan court noted the "danger that a jury will attach more importance to the testimony of a lawyer in a case than to an ordinary witness. The better practice would have been to have stepped out of the case when it became necessary for him to testify." p. 737.
The impropriety of an attorney testifying in a matter in which he has an interest is reflected in the Kansas Code of Professional Responsibility. Canon 5 states that "[a] lawyer should exercise independent professional judgment on behalf of a client." The pertinent disciplinary rules provide:

*61 "DR 5-101 ... (B) A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:
"(1) If the testimony will relate solely to an uncontested matter.
"(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
"(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.
"(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.
"DR 5-102(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101(B)(1) through (4)." 225 Kan. cii (1979).
Kansas cases considering the propriety of admission of a prosecuting attorney's testimony in a criminal case in view of the Code of Professional Responsibility have found no reversible error where the testimony does not contradict the defense, State v. Spencer, 186 Kan. 298, 303, 349 P.2d 920 (1960) (district attorney's testimony that he returned a pawn ticket and retrieved the stolen rings corroborated murder suspect's confession to stealing and pawning the rings), or when the testimony relates to form rather than substance, State v. Johnson, 224 Kan. 466, 467, 580 P.2d 1339 (1978) (part-time deputy county attorney allowed to testify to mailing notice to defendant and return of certified mail receipt).
Other jurisdictions have also had the opportunity to consider the propriety of allowing a prosecuting attorney to testify in criminal proceedings. See generally Annot., Prosecuting Attorney as Witness 54 A.L.R.3d 100. Reversible prejudice results from the attorney's testimony when the attorney actively participates in the criminal prosecution and is a primary witness, State v. Hayes, 473 S.W.2d 688 (Mo. 1971), or when the attorney participates in the prosecution and in his testimony states his opinion as to the guilt of the accused, People v. Arends, 155 Cal. App.2d 496, 318 P.2d 532 (1957) (deputy prosecutor prepared but did not try case, *62 and testified that unless the prosecutor's office believed in the accused's guilt, the case would be dismissed).
The general rule against prosecution testimony is not absolute, and admission is justified in certain circumstances. See Backo v. Local 281, United Bro. of Carpenters & Joiners, 438 F.2d 176 (2d Cir.1970), cert. denied 404 U.S. 858 (1971) (testimony of assistant prosecutor concerning jurisdictional prerequisite solely within knowledge of prosecuting attorney and trial judge, and after testifying, co-counsel gave summation). Where the attorney testifying did not actively participate in the prosecution, allowance of his testimony is not an abuse of judicial discretion. McKenzie v. State, 507 P.2d 1333 (Okla. 1973) ("where counsel is not personally prosecuting, he may testify in rebuttal." p. 1336). Thus, in People v. Hauschel, 37 Colo. App. 114, 550 P.2d 876 (1975), the trial court disapproved of the practice of allowing a prosecuting attorney to testify on behalf of the State, but found no reversible error where the attorney's prosecutorial participation was limited and the attorney/witness did not participate after testifying. Such testimony constitutes reversible error only when the testimony is of "sufficient consequence to have prevented a fair trial." p. 117. Likewise, in State v. Koller, 87 Wis.2d 253, 274 N.W.2d 651 (1979), an assistant district attorney who prepared a criminal complaint, but did not conduct the trial, was allowed to testify to correct a clerical error. In People v. Thomas, 38 Ill. App.3d 685, 348 N.E.2d 282 (1976), the Illinois court, like this court, acknowledged that the danger in allowing prosecutors to testify was in the extraordinary credibility likely to be given to that attorney by the jury which the ordinary witness would not have. In Thomas, the court found no error in allowing a prosecuting attorney to testify where the attorney did not actively prosecute the case though he was attorney of record, where the testimony related to a collateral issue and not to the actual occurrence, and the testimony was necessary to dispel unfavorable inferences of prosecutorial misconduct caused by the defense counsel's cross-examination.
In further support of the proposition that it is not automatically reversible error for a prosecutor to testify in a criminal proceeding, we note People ex rel. Younger v. Superior Court, 86 Cal. App.3d 180, 150 Cal. Rptr. 156 (1978). In that case, the court found an abuse of judicial discretion in recusing the entire *63 district attorney's prosecutorial staff in a criminal prosecution because one attorney who interviewed a witness had testified as to identity in pretrial proceedings. The court considered the California counterpart to Kansas DR 5-102(A) requiring withdrawal of the attorney and his firm when it is learned that the attorney will be a witness in the trial of his client. The court held this provision to be inapplicable to the district attorney's office and his prosecutorial staff, holding that it contemplated, instead, firms engaged in the practice of law for remuneration.
In this case, Hamilton did not participate in the trial in any capacity other than as a rebuttal witness. The content of her testimony was neither accusatory nor inflammatory. We find no abuse of judicial discretion in allowing her to testify on behalf of the State.
Defendant, as his final point, contends the trial court erred in denying his motion for judgment of acquittal at the close of the State's evidence on the charges of aggravated burglary and rape, because there was insufficient evidence of forcible rape underlying the aggravated burglary charge. The evidence presented by the State showed that the victim had recently had intercourse; that when found, she was nude below the waist; and had been brutally stabbed and slain. There was also evidence of an unauthorized entry by prying off a screen, gaining entrance through a rear window. Giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, we hold the trial court properly held that a reasonable mind could fairly conclude guilt beyond a reasonable doubt, and properly denied the accused's motion for judgment of acquittal. State v. Racey, 225 Kan. 404, 407, 590 P.2d 1064 (1979). Likewise, there was no error in the trial court's refusal to dismiss the aggravated burglary and rape charges following the preliminary hearing.
The judgment of the district court is affirmed.
HOLMES, J., concurring in part and dissenting in part.
I concur with the result reached by the majority and the greater portion of the majority opinion. I must respectfully dissent from the conclusion of the majority that it was not an abuse of judicial discretion to allow the testimony of Assistant District Attorney Joan Hamilton.
*64 Dr. Baker testified as a medical expert concerning his findings upon physical examination of the vaginal area of alleged rape victims. Hamilton was allowed to testify in rebuttal as to her observations on occasions when she had been present during the physical examination of numerous rape victims. Nothing was presented to establish Hamilton as an expert to rebut the medical testimony of Dr. Baker. She was not shown to have any medical training or expertise in the examination of a woman's vaginal area and her testimony was simply that of a layman's observations by a person present in the examination room. She was not an active participant in the medical examinations and her testimony did not rebut the medical aspects of Dr. Baker's testimony.
The majority has adequately reviewed the case law and the canons of professional responsibility on the subject of a member of the prosecutor's staff being allowed to testify in a criminal prosecution. The testimony of a member of the prosecutor's staff should be allowed only as to purely formal and technical matters peculiarly within the knowledge of the prosecutor or his staff.
I would hold that the admission of the testimony of Joan Hamilton constituted an abuse of judicial discretion and was clearly error. However, considering the entire record and the totality of the circumstances, it is my opinion the error was harmless beyond a reasonable doubt.
FROMME and MILLER, JJ., join the foregoing concurring and dissenting opinion.